1   Todd D. Carpenter
    todd@lcllp.com
2   **LYNCH CARPENTER, LLP**
    1350 Columbia Street, Suite 603
3   San Diego, CA 92101
    Telephone:  619-762-1910
4   Facsimile:   412-231-0246

5   *Attorneys for Plaintiff and the Proposed Classes*

6

7

8                **UNITED STATES DISTRICT COURT**

9                **SOUTHERN DISTRICT OF CALIFORNIA**

10  RYAN CHIEN, individually and on       Case No. 3:22-cv-00020-GPC-NLS
    behalf of all others similarly situated,
11                                         **FIRST AMENDED CLASS
                   Plaintiff,              ACTION COMPLAINT FOR
12                                         DAMAGES AND INJUNCTIVE
             v.                            RELIEF BASED ON:**
13
    BUMBLE INC., BUZZ HOLDINGS L.P.        **1. Negligence**
14  and BUMBLE TRADING LLC,
                                           **2. Restitution/ Unjust Enrichment**
15                 Defendants.
                                           **3. Invasion of Privacy**
16
                                           **4. Intrusion Upon Seclusion**
17                                         **5. Violation of the California Unfair
                                           Competition Law, Cal. Bus. & Prof.
18                                         Code §§ 17200 *et seq.***
19                                         **6. Violation of the California False
                                           Advertising Law, Cal. Bus. & Prof.
20                                         Code §§ 17500 *et seq.***
                                           **7. Violation of the California
21                                         Consumer Privacy Act, Cal. Civ.
                                           Code § 1798.100 *et seq.***
22                                         **8. Violation of California
                                           Comprehensive Data Access and
23                                         Fraud Act, Cal. Pen. Code § 502**
24                                         **DEMAND FOR JURY TRIAL**

25        Plaintiff Ryan Chien ("Plaintiff")  complains upon knowledge as to himself

26  and his own actions and upon information and belief as to all other matters against

27  Defendants   Bumble  Inc.,   Buzz   Holdings L.P.   and   Bumble   Trading   LLC

28  (collectively, "Bumble" or "Defendants"), as follows:

## I.      SUMMARY OF ALLEGATIONS

1.      This action arises from Defendants' unlawful and intentional collection and use of users' personally identifiable information, including biometric information ("PII"), without their consent and subsequent unauthorized disclosure of that information in violation of state law.

2.      In 2014, former Tinder founder Whitney Wolfe Herd partnered with Russian-British billionaire technology entrepreneur Andrey Andreev to create Bumble, a dating app with its mission to end misogyny by empowering women. Bumble is wildly popular and boasts approximately one hundred million registered users worldwide.

3.      Bumble is the dating app that puts the power in women's hands. For a man to be able to contact a woman, she must first have shown interest in him, adding a layer of privacy and safety that other dating services lack.

4.      Bumble shares a lot of the same features as the popular Tinder app, notably the concept of "swiping right" to show your interest in a fellow user. Unlike Tinder, however, women exclusively control the interactions in heterosexual communications on Bumble. Bumble does this because the app is premised on safety and allowing users to control communications and protect their privacy.  Bumble touts the app as part of a movement create a more safe, kind, and accountable internet.

5.      Unbeknownst to its users, however, Defendants use automated software, proprietary algorithms, AI, facial recognition, and other technologies to commercially profit from Plaintiff's and Class (defined below) members' PII and identities, including unique identifying information, biometric data and information, images, geolocation, names, e-mail addresses, passcodes, social media accounts, messaging services, telephone numbers, and other private, non-public, or confidential data and information, or meaningful combinations thereof, as more fully set forth herein.

6.      To use Bumble, users create and populate their profiles and Bumble collects personal identifying information including: name; username; email address; mobile number; gender identity; date of birth; sexual preference; photographs; location; and login information for social media accounts connected to Bumble Account (including Facebook and Instagram accounts).   Users are required to create a password for their Bumble account during the registration process.

7.      Since Bumble is a dating app, users provide highly personal information in their profile descriptions such as name, age, education, smoking and drinking preferences, voting status, political preference, religious beliefs and zodiac sign.   Users also upload photos to their profiles.

8.      Bumble also collects device information (unique device identifier, device model, operating system, and MAC address) from its users along with other sensitive information.   If users purchase Bumble's premium services, Bumble processes and retains users' payment information.   Bumble also tracks user's interactions with links available on Bumble to third party services and shares click statistics such as how many times a particular link was clicked.

9.      Further, Bumble also collects data concerning its users' geolocation and interactions with the site including data concerning sexual orientation and their "wish" (the types of people they are looking to date based on their "swiping" record profile information).

10.     Bumble harvests this extensive trove of data without the knowledge or consent of its unsuspecting users and shares the collected data with third parties, including the social media companies Facebook and Instagram.

11.     Further, unbeknownst to its members, the app's photo verification feature scans a user's facial geometry before running an algorithm to verify the user, collecting the user's biometric information.   Separately, the app's "Private

Detector" feature, through artificial intelligence, censors lewd content sent privately to users.

12.    Users who registered for or used Bumble and interacted with the app did not consent to Defendants' collection, retention, or release of their PII, including their biometric information. Because of the app's emphasis on safety and security, Bumble customers trust that their personal information will be maintained in a secure manner and kept from unauthorized disclosure.

13.    Defendants engaged in this conduct without adequately informing impacted individuals, including Plaintiff and members of the proposed Classes, that their personal information was being collected and disseminated. Worse, Bumble actively concealed the taking of personal information through the use of "dark patterns" on the app, as described below.

14.    What makes Defendants' conduct even more egregious is that Bumble experienced a data breach in March 2020 wherein an unauthorized individual was able to access Bumble's entire user database, exposing the profiles of all of its users. Bumble *never* disclosed that the database had been breached and the user information exposed in this way.

15.    This security breach left all of the profiles of Bumble users exposed for at least 8 months, and on information and belief, even longer.  And despite Bumble's public statements that it addressed its security vulnerabilities, as of November 2020, Bumble user data was still exposed.

16.    To this day, Bumble has not even notified its users that their data was left unprotected for such an extended period of time. Bumble's negligent treatment of these security vulnerabilities directly contradicts its assurances of security and privacy to its users.

17.    Given the concealed and secretive nature of Defendants' conduct, Plaintiff believes that more evidence supporting the allegations in this Complaint will be uncovered after a reasonable opportunity for discovery.

## II.    **PARTIES**

18.    Plaintiff Ryan Chien is a natural person and citizen of the State of California and a resident of San Diego County.

19.    Defendant Bumble Inc., incorporated in Delaware on October 5, 2020, is an American social media company that previously operated the Bumble online dating application.  Bumble Inc. maintained its principal place of business at 1105 West 41st Street, Austin, Texas 78756.

20.    Prior to the completion of its initial public offering on February 16, 2021, Bumble Inc. undertook certain reorganization transactions (the "Reorganization Transactions") such that Bumble Inc. is now a holding company, and its sole material asset is a controlling equity interest in Defendant Buzz Holdings L.P. ("Bumble Holdings"). As the general partner of Bumble Holdings, Bumble Inc. now operates and controls all of the business and affairs of Bumble Holdings, has the obligation to absorb losses and receive benefits from Bumble Holdings and, through Bumble Holdings and its subsidiaries, conduct its business.

21.    Bumble Inc. "operates as a single operating segment."[1] Its "chief operating decision maker is the CEO, [Ms. Wolfe Herd,] who reviews financial information presented on a consolidated basis, accompanied by disaggregated information about [Bumble Inc.'s] revenue, for the purpose of making operating decisions, assessing financial performance and allocating resources." *Id.*

22.    Bumble Inc. "provides online dating and social networking platforms though subscription and credit-based products . . . [and] provides these services through websites and applications that it owns and operates." *i.e.*, the Bumble app. Sept. 2021 10-Q, at pp. 12, 34.

23.    Bumble Inc. employs "a global team of software engineers and product managers who drive the development" of the Bumble app platform. 2021

---

[1] *See* Bumble Inc. Form 10-K for the fiscal year ended 12/31/21 (the "2021 10-K"), available at https://ir.bumble.com/static-files/d9c3cdb9-04a8-4f0d-b694-f31741ca7bbd, at 32 (last accessed Mar. 25, 2022).

10-K, at p. 8. Bumble Inc. continues "to invest in technology, marketing and product innovation." *Id.* at p. 57. Key investment areas . . . include machine learning capabilities, including improving [its] matching and content moderation technologies; features that enhance trust and safety on [its] platform; new offerings that enhance user engagement and retention; marketing, data analytics, and personalization capabilities; and new subscription and consumable offerings to drive incremental value to Paying Users." *Id.*

24.    Bumble Inc. monetizes the Bumble app via "a freemium model where the use of [its] services is free and a subset of [its] users pay for subscriptions or in-app purchases to access premium features." Sept. 2021 10-Q, at p. 38. Bumble Inc. primarily derives its revenue from the purchase and/or renewal of Bumble app subscriptions and in-app purchases, generating $142.5 million in revenue in the third quarter of 2021 alone. *Id.* 14. However, Bumble Inc.'s revenue is offset by a number of expenses, including "selling and marketing expense consist[ing] primarily of brand marketing" and "[p]roduct development expenses consisting primarily of compensation . . . for personnel engaged in the design, development, testing and enhancement of product offerings and related technology." 2021 10-K, at pp. 61–62.

25.    Bumble Inc. acquires new Bumble app users "through investments in marketing and brand." 2021 10-K, at p. 56.  Bumble Inc. converts new app users to "Paying Users by introducing premium features which maximize the probability of developing meaningful connections and improving their experience." *Id.*

26.    Bumble Inc. "regularly review[s] a number of metrics," including the number of Bumble app paying users and the average revenue per Bumble app paying user to "measure [its] performance, identify trends in [its] business, prepare financial projections, and make strategic decisions." Sept. 2021 10-Q, at p. 35.

27.    Bumble Inc. directs and controls the operations of Defendant Bumble Trading LLC ("Bumble Trading"), who is responsible for the marketing and

advertising of the Bumble app in the United States. The Chief Executive Officer ("CEO") of Bumble Inc., Ms. Wolfe Herd, is a director of Bumble Trading, the President of Bumble Inc., Mr. Tariq Shaukat, is employed as the President of Bumble Trading, and the Chief Financial Officer of Bumble Inc., Ms. Anuradha Subramanian, is employed as the Chief Financial Officer of Bumble Trading, with Bumble Inc. being the ultimate parent company of Bumble Trading.

28.    Bumble Inc. directs and controls the operations of Bumble Holding Limited, a United Kingdom corporation, who owns the rights to the Bumble trademarks, domain names, user data, and other data from the Bumble app, and who is responsible for distributing the Bumble app on the Apple App Store and Google Play Store in the United States. Ms. Wolfe Herd and Mr. Shaukat formerly served as directors of Bumble Holding Limited until March 2022. Upon information and belief, Ms. Wolfe Herd serves as the CEO of Bumble Holding Limited. Bumble Inc. is designated as a person with significant control of Bumble Holding Limited, holding 75% or more or the voting rights in Bumble Holding Limited, with Bumble Inc. being the ultimate parent company of Bumble Holding Limited.

29.    Bumble Inc., Bumble Trading, and Bumble Holding Limited are parties to the Bumble app's terms and conditions, entered into with users of the Bumble app, while Bumble Trading and Bumble Holding Limited are parties to the Bumble app's privacy policy, entered into with users of the Bumble app.

30.    Defendant Bumble Holdings is a Delaware limited partnership which operates the Bumble app. Bumble Holdings maintains its principal place of business at 1105 West 41st Street, Austin, Texas 78756.

31.    The CEO of Bumble Inc., Ms. Wolfe Herd, is the CEO of Bumble Holdings, and serves on the board of directors of the general partner of Bumble Holdings.

32.     Defendant Bumble Trading is a Delaware limited liability company, responsible for the marketing and advertising of the Bumble app. Bumble Trading is a controller of personal information collected and processed through the Bumble app. Bumble Trading maintains its principal place of business at 1105 West 41st Street, Austin, Texas 78756.

III.     **JURISDICTION AND VENUE**

33.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) & 1367 because: (i) this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; (ii) there are 100 or more class members; and (iii) some members of the class are citizens of states different from some Defendants.

34.     The Court has personal jurisdiction over Defendants because Defendants have affirmatively established and maintained sufficient contacts with California and conduct significant business in this State.

35.     Defendants' deliberate gathering of California users' PII is intentionally targeted toward California residents, including Plaintiff and the Classes, and constitutes purposeful activity directed at devices and individuals in California.

36.     Defendants' collection of California residents' PII, including biometric information, is by deliberate and intentional design. Defendants collect photos of California residents' and verify their identities as a "promise that the person you're talking with is who they say they are, so you can keep on swiping and dating with confidence."[2] Defendants even tout that "Bumble is the first app in the U.S. in its space with this catfish-catching technology!" *Id.*

---

[2] *See How to Get Verified on Bumble*, Bumble, available at https://bumble.com/en-us/the-buzz/the-end-of-catfishing-introducing-photo-verification (last accessed Apr. 8, 2022).

37.     Defendants also collect "location information" from California-based devices of California residents by harvesting the devices' GPS data and Wi-Fi information each time the Bumble app is opened on a California-based device.

38.     Defendants use the collected location information to update and display the name of the device user's current city and the device user's distance from other Bumble app users when the user's device launches the Bumble app.[3]

39.     Defendants' collection of California residents' user location information is deliberate and intentional by design. If a user does not grant Defendants' permission to collect the user device's location information, the Bumble app is effectively worthless as a user will be unable to be seen by other users, swipe on other users, or match with other users.[4]

40.     Defendants' deliberate gathering of California users' biometric information and location information is intentionally targeted toward California residents, including Plaintiff and the Class, and constitutes purposeful activity directed at devices and individuals in California and this District.

41.     In addition, Defendants primarily derive revenue from subscription and in-app purchases to use the Bumble app's premium features. In the third quarter of 2021, Defendants had 1.5 million Bumble app paying users, generating average revenue of $30.99 per paying user. Bumble Inc. Sept. 2021 10-Q, at p. 35. Upon information and belief, Defendants generate revenue from thousands of paying users who reside in California, including this District.

42.     By deriving revenue from California residents, this constitutes purposeful activity directed at devices and individuals in California and this District.

---

[3] *See* Nicole Campbell, *All You Need to Know about How Does Bumble Location Work*, iToolab, available https://itoolab.com/location/how-does-bumble-location-work/ (last accessed Apr. 8, 2022).

[4] *See How Does Bumble Work?*, Bumble, available at https://bumble.com/en/help/can-i-use-bumble-without-location-permissions (last accessed Apr. 8, 2022).

43.     In addition, Defendants encourage residents of California and this District to use the Bumble app by touting their photo verification feature to potential California-based users: "Now you can flirt, connect, and network comfortably, knowing the person you're talking to is exactly who they say they are."[5] Indeed, upon information and belief, Defendants expressly target their advertisements by state, including within California and this District, in order to gain brand awareness and encourage California residents to use the Bumble app.

44.     Various sections of Defendants' Privacy Policy have a California-centric focus, containing disclaim for "Users who are California residents."[6]  One of these sections sets forth, in capital letters, "YOUR CALIFORNIA PRIVACY RIGHTS."  No other state is so singled out in the Privacy Policy.

45.     Venue is proper in this County under 28 U.S.C. § 1391(b)(2) as a substantial portion of the transactions and allegations complained of herein occurred here. Alternatively, venue is proper under 28 U.S.C. § 1391(b)(3) because this Court has personal jurisdiction over Defendants.

## IV.    <u>FACTUAL ALLEGATIONS</u>

### *Background on the Bumble App*

46.     Launched in 2014, Bumble is a popular dating app built for women, where women make the first move. It is the second-most popular dating app in the U.S. after Tinder. As of January 2021, the app has a monthly user base of 42 million people.

47.     Users can sign up for Bumble using their phone number or Facebook profile. Early on, Bumble users were required to log in via Facebook when signing up but in April 2018, Bumble added an option to sign up with a phone number only.

---

[5] *See How to Use Bumble's Photo Verification Feature*, Bumble, available at https://bumble.com/en-us/the-buzz/request-verification (last accessed Mar. 25, 2022).

[6] www.bumble.com/privacy.

48.    For users who sign up with Facebook, information from their account is used to build a profile with photos and personal information, including the user's college and job.

49.    When in the app, users swipe right to "like" a potential match and left to reject them.  In heterosexual matches, only female users can make the first contact with matched male users, while in same-sex matches either person can send a message first.

50.    In addition to dating, Bumble offers users the opportunity to develop platonic connections through Bumble BFF for friendships and Bumble Bizz for professional networking and mentorship.

51.    In March 2016, Bumble released BFF mode as a way for users to find platonic friends. After switching into the mode, the app replaces potential dates with people of the user's same sex who are also looking for friends.

52.    In October 2017, the company launched Bumble Bizz which uses a woman-first interface as an attempt to address sexism in business networking.

53.    Bumble BFF and Bumble Bizz have a format similar to the dating app, requiring users to set up profiles and matching users through "yes" and "no" votes, similar to the dating platform.

54.    Bumble represents the app platform to be safe and empowering for women to provide a better dating environment for all users. In Defendants' own words, "Bumble provides opportunities to safely and easily connect with others." *See* https://bumble.com/en/date (last accessed 9/6/21).

55.    In April 2016, the Bumble app was updated to combat "ghosting" behavior. As part of the update, if a user is messaged after matching with a potential partner and fails to respond within 24 hours, the match disappears. Before the update, men were allowed unlimited time to respond to a message from women. This same update was also launched for same-sex matches, with either party allowed to initiate and the other having to respond within 24 hours.

56.    Protecting the identity of its users is at the very heart of the Bumble app. The app's central feature is that only women can initiate a conversation in heterosexual matches, sparing users from the spamming that women often endure on other dating sites.

57.    Bumble is marketed as an app which empowers women to make the first move by giving them the ability to control the conversation thereby allowing users to create "safe and healthy connections."[7]

58.    According to Whitney Wolfe Herd, founder and CEO of Bumble, the app's growth in popularity is owed to the brand's "safety, mission and women first narratives." [8]

**Bumble's Data Collection Practices**

59.    Bumble requires its customers to provide PII to use the app. It collects, retains, and uses that data to maximize profits through predictive marketing and other targeted marketing practices. By collecting, using, and deriving significant benefit from customers' PII, Bumble had a legal duty to take reasonable steps to protect this information from disclosure.  As discussed below, Defendants had a legal duty to take reasonable steps to protect customers' PII under applicable federal and state statutes, including Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, and the California Consumer Protection Act of 2018 (the "CCPA"), Cal. Civ. Code § 1798, *et seq.*

60.    When a user downloads the app and creates an account, Bumble collects the following information at registration: name; username; email address; mobile number; gender identity; date of birth; sexual preference; photographs; location; and login information for social media accounts connected to Bumble

---

[7] *See* https://bumble.com/en/help/what-is--bumble (last accessed 9/6/21).

[8] Levi Sumagaysay, Dating App Bumble Blows Past Expectations, Adding Users and Turning a Profit, MarketWatch (May 12, 2021), available at https://www.marketwatch.com/story/dating-app-bumble-blows-past-expectations-adding-users-and-turning-a-profit-11620852775 (last accessed 9/6/21).

Account (including Facebook and Instagram accounts).  Users are required to create a password for their Bumble account during the registration process.

61.    Bumble also collects device information (unique device identifier, device model, operating system, and MAC address) from its users along with other sensitive information.  If users purchase Bumble's premium services, Bumble processes and retains users' payment information.  Bumble also tracks user's interactions with links available on Bumble to third party services and shares click statistics such as how many times a particular link was clicked.

62.    Many categories of information collected by Bumble from consumers fall within recognized categories of "personal information" under the CCPA, including:

- Identifiers, such as name and location;
- Personal information, as defined in the California customer records law, such as contact (including email and telephone number) and financial information;
- Characteristics of protected classifications under California or federal law, such as age, gender identity, marital status, sexual orientation, race, ancestry, national origin, religion, and medical conditions;
- Commercial information, such as transaction information and purchase history;
- Biometric information;[9]
- Internet or network activity information, such as browsing history and interactions with our Bumble sites and the app;
- Geolocation data, such as mobile device location;

_____

[9] Though Bumble has previously listed the collection of biometric information in its Privacy Policy, it states that the category is "not relevant here."  As alleged herein, Bumble in fact collects biometric information from its users which give rise to the violations asserted, and in contravention of its own Privacy Policy.

- • Audio, electronic, visual and similar information, such as photos and videos;

- • Professional or employment-related information, such as work history and prior employer;

- • Non-public education information; and

- • Inferences drawn from any personal information to create a profile or summary about, for example, an individual's preferences and characteristics.[10]

63.     Bumble launched a photo verification tool in September 2016 to ensure that users were the same people in their profile pictures and with the stated goal of protecting users from fake accounts. To be verified, users are asked to submit a selfie in a specific pose. The picture is then reviewed through an automated process. Bumble employees may also conduct a review to ensure the user is the person in the profile pictures.

64.     Bumble states that the verification feature is optional but encourages its use. To verify an account, the user taps a "verify" button in their profile. They are then prompted with an example of one of a hundred random photo poses created by Bumble and asked to take a selfie mimicking that pose. After a user's photo is reviewed, they quickly receive a confirmation or rejection of their verification. Users are also encouraged to ask each other to validate their profiles while chatting to make sure that they are talking to real people. Users who are reported as potentially fake are rejected in verification have their profile turned off. If however a user's photo is verified, the user will continue using the app as normal. Photos used for photo verification are not uploaded to the user's profile.

---

[10] *See* Bumble's Privacy Policy, available at https://bumble.com/privacy/ (last accessed 9/6/21).

   

65.    In connection with its facial verification feature, Defendants implemented an artificial intelligence tool that automatically performs facial scans. In doing so, the app extracts geometric data relating to the unique points and contours (i.e., biometric identifiers) of each face, and then uses that data to create a template of each face.

66.    When people upload real selfies to the photo verification feature, the app may take over a minute to analyze the photo and respond with an affirmation or rejection of the photo. However, when faced with photos of a subject other than a human face, the photo verification feature quickly responds with a rejection message. Thus, it is evident that the data is analyzed by an automated system that scans the photo to recognize a face.



67.    In 2017, the International Organization for Standardization (ISO) and the International Electrotechnical Commission (IEC) released a document providing definitions for biometric information. According to this document, biometric recognition is defined as "automated recognition of individuals based on their biological and behavioural characteristics."[11]

68.    Moreover, the ISO/IEC document adds that "automated recognition implies that a machine based system is used for the recognition either for the full process or assisted by a human being." *Id.*, at § 3.1.3, n.4.  It is evident that Bumble automatically analyzes biometric information here.

---

[11]  *See*  https://standards.iso.org/ittf/PubliclyAvailableStandards/c066693_ISO_IEC_2382-37_2017.zip  (last accessed 9/6/21) at § 3.1.3.

1   ***Bumble's Collection of Behavioral Data and Content Moderation***

2       69.     Bumble "is the first major social platform to embrace behavioral

3   guardrails and content moderation as part of its business model."[12] Defendants

4   leverage "innovative technology solutions to create a more inclusive, safe and

5   accountable way to connect online for all users regardless of gender."[13]

6       70.     Bumble uses artificial-intelligence technology to conduct content

7   moderation for violations of its app standards like hate speech, even when no users

8   report the behavior. The goal is to identify people who are likely to engage in bad

9   behavior before they do anything.

10      71.     For example, according to Bumble's Chief Product Officer, Bumble's

11  technology scans profiles for violent images and recognizes at least 700 "stop

12  words" inside of chats. Each time the algorithm uncovers a violation, it is referred

13  to a team of human moderators who then decide whether blocking the user is

14  appropriate. In 2020, Bumble "logged more than 880,000 incidents that violated

15  its guidelines." [14] The company reported that its latest efforts are tailored to address

16  body shaming.[15]

17      72.     Apart from content moderation, Bumble boasts that its proprietary

18  machine learning capabilities in selecting potential matches for users and

19  determining which users are likely to become paid members and to prevent identity

20  fraud, among other things:

21

22  _____

    [12] Charlotte Alter, How Whitney Wolfe Herd Turned a Vision of a Better Internet

23  Into a Billion-Dollar Brand, TIME (Mar. 19, 2021), available at https://time.com/
    5947727/whitney-wolfe-herd-bumble/ (last accessed 9/6/21).

24  [13] *See* Bumble Inc. Form 10-K for the fiscal year ended 12/ 31/ 20 (the "2020 10-
    K"), available at https://ir.bumble.com/static-files/6873c49c-1778-4cbc-84ef-
25  27b9d291bd53, at p. 7 (last accessed 9/6/21).

    [14] *See* Jane Wakefield, *The Tech Billionaire Who is Putting Women First*, BBC
26  (Apr. 7, 2021), https://www.bbc.com/news/technology-56662100 (last accessed
    9/6/21).

27  [15] Charlotte Alter, How Whitney Wolfe Herd Turned a Vision of a Better Internet
    Into a Billion-Dollar Brand, TIME (Mar. 19, 2021), https://time.com/
28  5947727/whitney-wolfe-herd-bumble/ (last accessed 9/6/21).

> **Our data and machine learning capabilities:** We are continually analyzing data from user interactions on our platform, allowing us to constantly optimize the user experience. We have machine and deep learning capabilities that we leverage to personalize the potential matches we display and to inform our product pipeline. We are able to also target users who are likely to purchase a subscription package or in-app feature and tailor the experience for them. Our machine and deep learning posture plays a key role in identity fraud prevention as well as blocking inappropriate behavior and content from polluting our platform.

2020 10-K, at 8.

73.    As such, Bumble also automatically analyzes its users' behavioral information through its use of a matching algorithm which provides recommended potential connections to the user based on the user's preferences and Bumble's research and analytics concerning and the user's interactions with the app.

74.    Once users have signed up for the app, they are required to add photos that meet the app's guidelines. When users upload photos that do not include faces, the app immediately blocks them and requires the user to upload others. The same is true when users upload photos of children's faces. To clarify, when users upload pictures of objects or children, the app simply fails to upload the pictures to the profile and tells the user that there are no relevant matches in the area.





75.     In some cases, users later receive notifications that their picture has been moderated:



76.    Bumble's machine learning technology also identifies and flags potentially unwanted lewd images, which Bumble represents as a safety measure. The app's "private detector" artificial intelligence technology detects lewd pictures and blurs them out before recipients see them.

77.    Defendants unlawfully leverage user's PII and private content to improve their artificial intelligence technologies, thereby unjustly increasing their profits and revenues—and Bumble's market value.

78.    Despite its use of facial recognition technology to moderate content and verify users, Bumble denies that it captures or collects biometric information. While the app claims to promote security and transparency, Defendants do not explicitly mention this collection to users.

79.    The app's privacy policy also fails to mention its retention policy regarding PII.  And, as detailed below, the app does not require users' consent to its collection of biometric information or to the app's Privacy Policy in general. These practices contravene applicable common law and California statutory law.

**Bumble's Use of Dark Patterns to Avoid Disclosing Data Collection Practices**

80.    Though Bumble's privacy policy appears to contain some disclosures concerning its data collection practices, Bumble does not present these disclosures appropriately to consumers.  Plaintiff never received notice that Defendants would collect, capture, receive, otherwise obtain, store, and/or use his PII. Plaintiff never signed a written release authorizing Defendants to collect, capture, receive, otherwise obtain, store, and/or use his personal information and biometric information.

81.    In fact, based on counsel's investigation and analysis, Defendants deliberately designed Bumble's Terms of Service and Privacy Policy to decrease the likelihood that a user will notice and comprehend its terms and conditions or could provide meaningful, express consent, in order to encourage users to sign up and not be deterred by accurate and truthful disclosures.

82.    Plaintiff did not know nor expect that Defendants would collect, store, and use his PII when he used the app.

83.    Defendants adopted Terms and Conditions for the app, not seen in the ordinary course by users, which purport to disclose that the app takes some (but not all) of the private and personally identifiable user data and content described above. Bumble's Terms and Conditions, revealed by investigation of counsel but not seen in the ordinary course by users, purport to require arbitration and a class action waiver.

84.    The app does not require that users sign and agree to its Terms and Conditions or its Privacy Policy in order to use the app. It does, however, require that they agree to the app's Guidelines.



85.    Thus, Bumble does not explicitly require app users to agree to the Terms and Conditions or the app's Privacy Policy. Moreover, links to the Terms and Conditions and Privacy Policy are provided in extremely small letters on the bottom of the app's sign-up page, presented in almost the same hue as the app's background:

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13



14    86.    Defendants' design practice is termed a Dark Pattern, a user interface

15    designed to trick the user by purposely focus the person's attention on one thing in

16    order to distract their attention from another. Bumble's choice of elusive font and

17    color guarantees that most new users will not notice the presence of Bumble's

18    Terms and Conditions and Privacy Policy on their sign-up page and will thus never

19    read or agree to these terms.

20    87.    Defendants never provided app users any actual notice of privacy

21    policies or terms of use. Nor do Defendants present users with conspicuously

22    located and designed hyperlinks to their privacy policies and terms of use, much

23    less conspicuous warnings accompanying such hyperlinks. The app thus allows

24    users to utilize it without ever placing them on actual or constructive notice of the

25    privacy policies and terms of use. This lack of actual or constructive notice

26    deprives users of the opportunity to accept or reject Bumble's privacy policies and

27    terms of use, rendering such documents unenforceable.

28

88.     Even if Bumble users had knowingly accepted the terms of use (which they did not), any purported waiver of the right to seek public injunctive relief in a court of law is unenforceable under California law. *See, e.g., McGill v. Citibank,* 2 Cal. 5th 945 (2017); *Blair v. Rent-A-Center*, 928 F.3d 819 (9th Cir. 2019).

89.     The CCPA was recently amended to ban the use of Dark Patterns that prevent users from opting out of the sale of their personal data.

90.     Plaintiff and the Classes have incurred, and continue to incur, harm as a result of the invasion of privacy stemming from Defendants' covert theft of their private and personally identifiable data and private content in the form of diminution of the value of their PII and content as a result of Defendants' surreptitious and unlawful activities.

91.     Plaintiff and the Classes have also suffered and continue to suffer injuries to their mobile devices. The battery, memory, CPU and bandwidth of such devices have been compromised, and as a result the functioning of such devices has been impaired and slowed, due to Defendants' secretive and unlawful activities.

92.     Defendants violated the CCPA in collecting and using personal information without providing consumers with notice consistent with the CCPA, in violation of Civil Code section 1798.100(b) and section 1798.115(d), and by otherwise failing to inform users of the personal information collected about them and the third parties with whom that personal information was shared, in violation of Civil Code section 1798.110(c).

93.     Further, Defendants failed to use a reasonable standard of care to protect Plaintiff's and Class Members' biometric identifiers and information from disclosure and, in fact, affirmatively disclosed their biometric identifiers and information.

94.     Particularly concerning are Defendants' publicly announced plans to grow the Bumble community so that Bumble's "marketing learnings" can be

shared "across our apps and geographies, which enable the broadest application of successful strategies."[16]

95.    Per the app's hidden Terms and Conditions, Bumble may assign or license users' content to its "affiliates and successors without further approval" of its users.[17]

**DEFENDANTS' BELATED AMENDMENTS TO ITS PRIVACY POLICY**

96.    Even if users did have actual or constructive notice of Bumble's privacy policy (they do not), Defendants' belated amendments further underscore its efforts to hide Bumble's collection of biometric data from its users.

97.    Prior to the filing of Plaintiff's Class Action Complaint on November 24, 2021, Bumble's privacy policy did not advise of its biometric collection practice. In fact, it disclaimed it, stating that its inclusion of "biometric information" in the CCPA's definition of personal information was "not relevant here."[18] Bumble's discussion of its "Profile Verification Information" also excluded any mention of the biometric data it captured.

98.    On December 12, 2021, less than a month after Plaintiff filed his Class Action Complaint, Bumble amended its Privacy Policy to, among other things, retitle the discussion of its profile verification procedures as "Profile Verification Information (Including Biometric Information)," and including a new paragraph stating:

> If you choose to verify your profile photo, we will scan each photo that you submit. The scan may include the use of facial recognition technology so that we can compare the photo you submit to your profile photo, to help ensure that you are who you say you are. We do not add the verification photos to your profile. We retain the scans so that we can verify you in the future and for our record-keeping purposes until we no longer need them for such purposes or for three

---

[16] *See* 2020 10-K, at p. 10.

[17] *See* Bumble Terms and Conditions of Use (as of Apr. 28, 2021), available at https://bumble.com/en/terms (last accessed 9/6/21).

[18] *See* Bumble Privacy Policy (as of November 24, 2021), available at https://web.archive.org/web/20211124055948/https://bumble.com/en/privacy (last accessed Apr. 8, 2022).

years after your last interaction with us, whichever occurs first. After the applicable retention period expires, we take commercially reasonable steps to permanently and securely delete the scans from our systems.[19]

99.   Bumble's December 12, 2021 amendments to its privacy policy also included, for the first time, reference to biometric information in its discussion of data retention and deletion.

100.   On March 7, 2022, Bumble further amended its privacy policy. Those amendments included, *inter alia*, omission of its prior disclaimer that reference to biometric information was "not relevant here."[20]

### The Data Breach

101.   In March 2020, a security researcher accessed Bumble's entire user database of nearly 100 million users and bypassed paying for the app's premium services by finding and exploiting the app's security vulnerabilities (the "Data Breach"). The entire process required only four days of work and application of a simple scrypt.

102.   Bumble's vulnerabilities are derived from its Application Program Interface ("API") which essentially acts as a messenger that takes requests from Bumble users, transfers them to the app's system and returns the necessary response back to the user. When Bumble users swipe on one anothers' profiles, pay for premium features or access users' photos, their requests are processed using this technology.

103.   Developers use APIs "to dictate how different parts of an application communicate with each other and can be configured to allow client-side applications to access data from internal servers and perform actions." Developers program their API to check whether the request issuer and authorized to perform a

---

[19] *See* Bumble Privacy Policy (as of December 21, 2021), available at https://web .archive.org/web/20220215221814/https://bumble.com/en/privacy (last accessed Apr. 8, 2022).

[20] *See* Bumble Privacy Policy (as of March 7, 2022), available at https://bum ble.com/en/privacy (last accessed Apr. 8, 2022).

given action. Without these checks, hackers can easily "manipulate API calls to perform unintended actions and retrieve unauthorized data."

104.    In Bumble's case, the unauthorized researcher was able to reverse engineer its web application's API to intercept all of its incoming and outgoing requests. Bumble's API did not do the necessary checks and thus allowed the researcher to repeatedly probe the server for information on Bumble users. According to the researcher, "these issues are relatively simple to exploit, and sufficient testing would remove them from production. Likewise, fixing these issues should be relatively easy as potential fixes involve server-side request verification and rate-limiting." [21]

105.    By exploiting the app's vulnerabilities, the researcher was able to bypass Bumble's premium features, such as unlimited right swipes per day and the "Beeline" feature, which lets users see the people who have swiped right on their profile, indicating interest in them.

106.    More importantly, by intercepting the app's API requests, the researcher was able to enumerate Bumble's worldwide users, reaching the individual identities of every one of its 100M users. The leaked data on each user included their public profile descriptions such as their name, age, education, smoking and drinking preferences, voting status, political preference, religious beliefs and zodiac sign.

107.    More importantly, Bumble leaked users' activity on the app, their sexual orientation and their "wish"—the types of people they are looking to date based on their "swiping" record. For each Bumble user, all of the pictures they had uploaded to the app were available to the public and if they had connected the

---

[21] *See* https://www.forbes.com/sites/thomasbrewster/2020/11/15/bumble-vulnerabilities-put-facebook-likes-locations-and-pictures-of-95-million-daters-at-risk/?sh=66492a2a3ddf (last accessed 9/6/21).

account to their Facebook account, the app leaked their interests and pages they had liked.



108.   Other troubling information that was leaked included whether they have the mobile application installed, whether the app has rated them as "hot," if they are online in real-time, and their distance in miles from the person accessing the data. As hackers can easily fake their location on the app, they could very easily track every user's exact location in real time.

109.   The researcher disclosed the vulnerabilities and her findings to Bumble as soon as March 30, 2020, but received no response from the company. She then made three more attempts to contact the company in June and July 2020 and again, received no response. Two hundred twenty-five days after the having been notified of the intrusion, Bumble had still not responded to the researcher's request or taken any action to fix its security flaws. When the researcher asked to publish the information, she received an email that "Bumble are keen to avoid any details being disclosed to the press."

110.   On November 1, 2020, the unauthorized researcher found that all of the attacks still worked. When retesting on November 11, 2020, however, she found that certain issues had been partially mitigated by Bumble. Specifically, at this point in time, the app's user database could no longer be dumped and the app could not leak users' distance in miles. However, users' Facebook interests, pictures and other profile information were still publicly available, even when the researcher's Bumble user was locked-out and unvalidated.

111.   To this day, Bumble has not notified its users of the vulnerabilities that left their data unprotected for over 200 days. Moreover, Bumble's spokesperson denied the security flaw, stating; "after being alerted to the issue we then began the multi-phase remediation process that included putting controls in place to protect all user data while the fix was being implemented. The underlying user security related issue has been resolved and there was no user data compromised."

112.   Nevertheless, the leaked data is extremely sensitive and detrimental to Bumble users. A tech-savvy Bumble user could find the app's vulnerabilities and exploit them just as easily as the security researcher above did. Such a user would have access to any profile that the app would keep private in the normal course, with respect to users requesting that their profiles be invisible to those who do not fit certain preferences of the profile-holder.

113.   In some cases, the simple fact that a person is using the app could be problematic if leaked. For example, if a Bumble user is married or in a relationship, the fact that she has an active Bumble user profile, if revealed, may have detrimental effects on her personal life and can thus be used to blackmail her. Moreover, LGBTQ users who have not publicly revealed their sexual preferences but have indicated them on Bumble are extremely vulnerable to ransom attacks and blackmail with heavy personal and professional consequences.

114.    The fact that an unauthorized person was able to access Bumble's user database when her user was moderated and blocked is also extremely problematic. Bumble takes pride in its secure features and claims to provide users with a safe and healthy space to meet others.  Bumble's practices do not comport with the standards it promotes to its users.

115.    It is also important to note that the app does not display users' full names or links to their Facebook accounts. This is done to maintain relative anonymity and protect users from harassment. However, the leaked data provided access to users' Facebook interests and likes and thus to their profiles which include their full names and additional private details.

116.    Bumble's negligent treatment of these security vulnerabilities directly contradicts its promises of security and privacy.

117.    Plaintiff and Class members have suffered and will continue to suffer harm because of the Data Breach.  Malicious actors use PII to gain access to Class members' digital life, including bank accounts, social media, and credit card details. During that process, hackers can harvest other sensitive data from the victim's accounts, including personal information of family, friends, and colleagues.  The compromised PII is especially sensitive given the nature of Defendants' services.

118.    The PII accessed in the Data Breach therefore has significant value to the hackers who may attempt to sell that information. In fact, names, mailing and email addresses, dates of birth, phone numbers, account information, and purchasing preferences are among the most valuable pieces of information for hackers.

119.    The PII accessed in the Data Breach is also very valuable to Defendants. Bumble collects, retains, and uses this information to increase profits through predictive and other targeted marketing. Bumble users value the privacy of this information and expect Bumble to allocate enough resources to ensure it is adequately protected. Users would not have used Bumble, uploaded personal

photos, provided payment card information, and/or paid the same prices for Bumble's services had they known Bumble did not implement reasonable security measures to protect their PII.

120.    The PII accessed in the Data Breach is also very valuable to Plaintiff and Class members. Consumers often exchange personal information for goods and services. For example, consumers often exchange their personal information for access to wifi in places like airports and coffee shops. Likewise, consumers often trade their names and email addresses for special discounts (e.g., sign-up coupons exchanged for email addresses). Consumers use their unique and valuable PII to access the financial sector, including when obtaining a mortgage, credit card, or business loan. As a result of the Data Breach, Plaintiff and Class members' PII has been compromised and lost significant value.

121.    Plaintiff and Class members will face a risk of injury due to the Data Breach for years to come. Malicious actors often wait months or years to use the personal information obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also re-use stolen personal information, meaning individuals can be the victim of several cyber crimes stemming from a single data breach. Finally, there is often significant lag time between when a person suffers harm due to theft of their PII and when they discover the harm. For example, victims rarely know that certain accounts have been opened in their name until contacted by collections agencies. Plaintiff and Class members will therefore need to continuously monitor their accounts for years to ensure their PII obtained in the Data Breach is not used to harm them.

122.    Plaintiff and Class members have and will continue to expend significant time and money to reduce the risk of and protect against identity theft caused by the Data Breach. According to the 2018 IBM/Ponemon Institute study, the average cost of a data breach in the United States is $242 per victim and roughly

$8 million per breach for companies. Where a consumer becomes a victim of identity theft and suffers $1 or more in direct or indirect losses, the average cost to the consumer is $1,343.

123.   Even when reimbursed for money stolen due to a data breach, consumers are not made whole because the reimbursement fails to compensate for the significant time and money required to repair the impact of the fraud. On average, victims of identity theft spend 7 hours fixing issues caused by the identity theft. In some instances, victims spend more than 1,000 hours trying to fix these issues.

124.   Victims of identity theft also experience harm beyond economic effects. According to a 2018 study by the Identity Theft Resource Center, 32% of identity theft victims experienced negative effects at work (either with their boss or coworkers) and 8% experienced negative effects at school (either with school officials or other students).

125.   The U.S. Government Accountability Office likewise determined that "stolen data may be held for up to a year or more before being used to commit identity theft," and that "once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years." [22]

**Defendants Failed to Take Reasonable Steps to Protect Users' PII**

126.   Defendants require their users to provide a significant amount of highly personal and confidential PII to use Bumble's services. Defendants collect, stores, and uses this data to maximize profits.

127.   Defendants have legal duties to protect its customers' PII by implementing reasonable security features. This duty is further defined by federal and state guidelines and industry norms.

---

[22] Available at https://www.govinfo.gov/content/pkg/GAOREPORTS-GAO-07-737/html/GAOREPORTS-GAO-07-737.htm (last accessed 9/6/21).

128.   Defendants breached their duties by failing to implement reasonable safeguards to ensure Plaintiff's and Class members' PII was adequately protected. As a direct and proximate result of this breach of duty, the Data Breach occurred, and Plaintiff and Class members were harmed. Plaintiff and Class members did not consent to having their PII disclosed to any third-party.

129.   The Data Breach was a reasonably foreseeable consequence of Defendants' inadequate security systems. Defendants have the resources to implement reasonable security systems to prevent or limit damage from data breaches. Even so, Defendants failed to properly invest in its data security. Had Defendants implemented reasonable data security systems and procedures (i.e., followed guidelines from industry experts and state and federal governments), then it likely could have prevented the infiltration of its systems and unauthorized access of its users' PII.

130.   Defendants' failure to implement reasonable security systems has caused Plaintiff and Class members to suffer and continue to suffer harm that adversely impacts Plaintiff and Class members economically, emotionally, and/or socially. As discussed above, Plaintiff and Class members now face an imminent and ongoing threat of identity theft and resulting harm. These individuals now must spend significant time and money to continuously monitor their accounts and credit scores to limit potential adverse effects of the Data Breach regardless of whether any Class member ultimately falls victim to identity theft.

131.   Defendants also had a duty to timely discover the Data Breach and notify Plaintiff and Class members that their PII had been compromised. Defendant breached this duty by failing to use reasonable intrusion detection measures to identify the Data Breach when it occurred, and then, once it learned of the Data Breach later, failing to inform affected users altogether.

132.  Defendants failed to recognize the impact of the Data Breach on Bumble users; they have not even offered impacted users credit monitoring services or other mitigation measures beyond what is available to the public.

133.  Even if Defendants had offered monitoring or other services to affected users, it would be insufficient to protect Plaintiff and Class members. As discussed above, the threat of identity theft and fraud from the Data Breach will extend for years and cost Plaintiff and the Classes significant time and effort.

134.  Plaintiff and Class members therefore have a significant and cognizable interest in obtaining equitable relief (in addition to any monetary damages) that protects them from these long-term threats. Accordingly, this action represents the enforcement of an important right affecting the public interest and will confer a significant benefit on the general public or a large class of persons.

***Plaintiff's Experience***

135.  Plaintiff is a Bumble user and has, within the applicable statute of limitations, posted a profile on the app and uploaded and posted numerous images of his face to Bumble.

136.  Defendants collected and stored Plaintiff's personal information and biometric information. Upon information and belief, Defendants have disclosed and/or disseminated these biometric identifiers or biometric information to third parties.

137.  At no point did Plaintiff consent to or authorize Defendants to intercept, record, disclose, or otherwise misuse his personal information or biometric information. Plaintiff would not have registered for or used for Bumble had he known that Defendants engaged in the unlawful actions described herein.

138.  Plaintiff would like to continue to use Bumble in the future but will be uncertain as to whether Defendants have ceased their unlawful practices and violation of his privacy rights without the equitable relief requested herein, specifically an injunction prohibiting Defendants from engaging in the unlawful

practices alleged herein. This is particularly the case given the surreptitious nature of Defendants' misconduct.

## V.    FRAUDULENT CONCEALMENT AND TOLLING

139.    The applicable statutes of limitations are tolled as a result of Defendants' knowing and active concealment of their unlawful conduct—through, among other things, their obfuscation of the source code, misleading public statements, and hidden and ambiguous privacy policies and terms of use. Plaintiff and the Classes were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their own part.

140.    Also, at the time the action was filed, Defendants were under a duty to disclose the true character, quality, and nature of their activities to Plaintiff and the Classes. Defendants are therefore estopped from relying on any statute of limitations.

141.    Defendants' fraudulent concealment is common to the Classes.

## VI.    CLASS ACTION ALLEGATIONS

142.    Plaintiff brings this action, individually, and on behalf of a class and subclass of similarly situated persons, pursuant to Fed. R. Civ. P. 23, defined as follows:

### Nationwide Class

All U.S. residents who registered for and/or used the Bumble app during the applicable limitations period (the "Class").

### California Subclass

All residents of California who registered for and/or used the Bumble app during the applicable limitations period. (the "California Subclass")[23]

143.    Excluded from the Class and California Subclass (collectively the "Classes") are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents,

---

[23] Plaintiff reserves the right to modify or refine the definition of the Classes.

successors, predecessors, and any entity in which Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

144. **Ascertainability**. The Classes are readily ascertainable because they are defined using objective criteria so as to allow Class members to determine if they are part of the Classes. Further, the Classes can be readily identified through records maintained by Defendants.

145. **Numerosity**. The Classes are so numerous that joinder of individual members herein is impracticable. The exact number of Class members, as herein identified and described, is not known, but publicly available information reveals that there are millions of app users in the United States. California makes up roughly 12% of the nation's population and is believed to be home to a disproportionate number of Bumble users relative to other states.

146. **Commonality**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including the following:

> a)      whether Defendants engaged in the activities and practices referenced above;

> b)      whether Defendants' activities and practices constitute a violation of the California Comprehensive Data Access and Fraud Act, Cal. Pen. Code § 502;

> c)      whether Defendants' activities and practices constitute an intrusion upon seclusion;

d) whether Defendants' activities and practices constitute a violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*

e) whether Defendants' activities and practices constitute a violation of the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

f) whether Defendants violated § 1798.150 of the CCPA by failing to prevent Plaintiff's and Class members' PII from unauthorized access and exfiltration, theft, or disclosure as a result of Defendant's violations of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information;

g) whether Defendants owed Plaintiff and Class members a duty to implement and maintain reasonable security procedures and practices to protect their personal information;

h) whether Defendants' activities and practices constitute negligence;

i) whether Defendants adequately addressed and fixed vulnerabilities that permitted the Data Beach to occur;

j) whether Defendants breached their duty to implement reasonable security systems to protect Plaintiff's and the Class members' PII;

k) whether Defendants' breach of the duty to implement reasonable security systems directly and/or proximately caused damages to Plaintiff and Class members;

l) whether and when Defendants learned of the Data Breach and whether the response was adequate;

m) whether Plaintiff and other Class members are entitled to credit monitoring and other injunctive relief;

n)    whether Defendant provided timely notice of the Data Breach to Plaintiff and Class members;

o)    whether, prior to the Data Breach, Defendants knew or should have known of the vulnerabilities in its systems that permitted them to be infiltrated;

p)    whether Defendants' activities and data collection practices constitute unjust enrichment concerning which restitution and/or disgorgement is warranted;

q)    whether Plaintiff and members of the Class and Subclass sustained damages as a result of Defendants' activities and practices, and, if so, in what amount;

r)    whether Defendants profited from their activities and practices, and, if so, in what amount;

s)    what is the appropriate injunctive relief to ensure that Defendants no longer unlawfully: **(i)** take private and personally identifiable user data and content; **(ii)** utilize private and personally identifiable user data and content to develop commercially valuable artificial intelligence technologies; **(iii)** utilize private and personally identifiable user data and content to create consumer demand for and use of Defendants' other products; **(iv)** cause the diminution in value of users' private and personally identifiable data and content; **(v)** cause injury and harm to users' mobile devices; **(vi)** cause users to incur higher data usage and electricity charges; **(vii)** retain the unlawfully collected user data, including all personal information and biometric information; and **(ix)** profile and target, based on the above activities, app users with advertisements and other content.

t)    what is the appropriate injunctive relief to ensure that Defendants take reasonable measures to ensure that they and relevant third

parties destroy unlawfully-acquired user data and content in their possession, custody or control.

147.   **Typicality**. Plaintiff's claims are typical of the claims of members of the Classes because, among other things, Plaintiff and members of the Classes sustained similar injuries as a result of Defendants' uniform wrongful conduct and their legal claims all arise from the same events and wrongful conduct by Defendants. Further, all Class members were subject to the Data Breach and had their PII exposed or accessed in the Data Breach. Likewise, Defendants' misconduct impacted all Class members in the same manner.

148.   **Adequacy**. Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff's interests do not conflict with the interests of the Class members, and Plaintiff has retained counsel experienced in complex class action and data privacy litigation to prosecute this case on behalf of the Classes.

149.   **Predominance & Superiority**. Common questions of law and fact predominate over any questions affecting only individual Class members, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy. The amount of damages available to Plaintiff is insufficient to make litigation addressing Defendants' conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

150.   **Final Declaratory or Injunctive Relief**. Defendants have acted or refused to act on grounds that apply generally to the Class and Subclass, making

final declaratory and/or injunctive relief appropriate with respect to the Class and California Subclass as a whole.

151. **Particular Issues**. The claims consist of particular issues that are common to all Class and California Subclass members and are capable of class-wide resolution that will significantly advance the litigation.  These issues include but are not limited to:

       a)      whether Defendants unlawfully collected PII from consumers;

       b)      whether Defendants adequately disclosed their data collection practices to consumers;

       c)      whether Defendants used dark pattens to gain access to consumers' PII as alleged herein;

       d)      whether Defendants owed a legal duty to Plaintiff and Class members to exercise due care in collecting, storing, using and safeguarding their PII;

       e)      whether Defendants failed to comply with its own policies and applicable laws, regulations and industry standards relating to data security;

       f)      whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

       g)      whether Plaintiff and Class members are entitled to actual damages, credit monitoring, other injunctive relief, and/or punitive damages because of Defendants' wrongful conduct.

## VII.  <u>CAUSES OF ACTION</u>

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of the Plaintiff and the Class)**

152. Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

153.   Plaintiff and the Class entrusted Defendants with their PII and content never intended for public consumption. Defendants had a duty to handle that data and content with care due its sensitivity, and the expectation that such data and content would not be shared with third parties or exposed in the Data Breach.

154.   Plaintiff's and the Class's willingness to entrust Defendants with their PII and private content was predicated on the understanding that Defendants would take appropriate measures to protect this data. Defendants had a special relationship with the Plaintiff and the Class as a result of being entrusted with their PII and content, which provided an independent duty of care.

155.   Defendants knew that the Plaintiff's and the Class's PII and content had value, and Defendants have earned substantial revenues and profits as a result of collecting and using PII and user content. This includes Defendants' profits and revenues from their targeted-advertising, improvements to their artificial intelligence technologies, and the increased consumer demand for and use of Defendants' other services.

156.   Defendants failed to use reasonable care to safeguard the Plaintiff's and the Class's PII and private content, giving third parties access to it without taking precautions to protect the Plaintiffs and the Class.

157.   Defendants' failure to use care in allowing access to the Plaintiff's and the Class's private and personally identifiable data and private content resulted in the Data Breach and caused foreseeable harm.  Defendants failed to, inter alia: (i) implement security systems and practices consistent with federal and state guidelines; (ii) implement security systems and practices consistent with industry norms; (iii) timely detect the Data Breach; and (iv) timely disclose the Data Breach to impacted customers.

158.   Defendants knew or should have known Plaintiff's and Class members' PII was highly sought after by hackers and that Plaintiff and Class members would suffer significant harm if their PII was stolen.

159.  Defendants also knew or should have known that timely disclosure of the Data Breach was required and necessary to allow Plaintiff and Class members to take appropriate actions to mitigate the resulting harm. These efforts include, but are not limited to, freezing accounts, changing passwords, monitoring credit scores/profiles for fraudulent charges, contacting financial institutions, and cancelling or monitoring government-issued IDs such as passports and driver's licenses. The risk of significant harm to Plaintiff and Class members (including identity theft) increases with the passage of time and continues to the present.

160.  Defendants had a special relationship with Plaintiff and the Class members who entrusted Defendants with several pieces of PII. Customers were required to provide PII when utilizing Defendants' services. Defendants had a duty to protect that information. Plaintiff and Class members were led to believe Defendants would take reasonable precautions to protect their PII and would timely inform them if their PII was compromised, and Defendants breached their duty when they failed to do so.

161.  Defendants negligently allowed third parties to access Plaintiff's and the Class's data and content, permitting it to be aggregated with other data and private content to identify, profile and target Plaintiff and the Class. As such, it is reasonable for Plaintiff and the Class to obtain identity protection and credit monitoring services, and to recover the cost of these services from Defendants.

162.  The injury to Plaintiff and the Class was a proximate, reasonably foreseeable result of Defendants' breaches of duty. Defendants failed to enact reasonable security procedures and practices and Plaintiff and Class members were the foreseeable victims of data theft that exploited the inadequate security measures. The PII accessed in the Data Breach is precisely the type of information that hackers seek and use to commit cyber crimes.

163.   Defendants' conduct also constitutes gross negligence due to their extreme departure from ordinary standards of care, and their knowledge that they had failed to secure the Plaintiff's and the Class's PII and private content.

**SECOND CAUSE OF ACTION**
**Restitution / Unjust Enrichment**
**(On Behalf of the Plaintiff and the Class)**

164.   Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

165.   Plaintiff and the Class have conferred substantial benefits on Defendants by downloading and using the app. These include the Defendants' collection and use of the Plaintiff's and the Class's PII and content never intended for public consumption. Such benefits also include the revenues and profits resulting from Defendants' collection and use of such data and content for Defendants' targeted-advertising, improvements to their artificial intelligence technologies, and the increased consumer demand for and use of Defendants' other products.

166.   Defendants knowingly and willingly accepted and enjoyed these benefits.

167.   Defendants either knew or should have known that the benefits rendered by the Plaintiff and the Class were given with the expectation that Defendants would not take and use the Plaintiff's and the Class's PII and content that Defendants have taken and used without permission. For Defendants to retain the aforementioned benefits under these circumstances is inequitable.

168.   Through deliberate violation of the Plaintiff's and the Class's privacy interests, and statutory and constitutional rights, Defendants each reaped benefits that resulted in each Defendant wrongfully receiving profits.

169.   Equity demands disgorgement of Defendants' ill-gotten gains. Defendants will be unjustly enriched unless they are ordered to disgorge those profits for the benefit of the Plaintiff and the Class.

170.   As a direct and proximate result of Defendants' wrongful conduct and unjust enrichment, the Plaintiff and the Class are entitled to restitution from Defendants and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by Defendants through this inequitable conduct.

### THIRD CAUSE OF ACTION
#### Invasion of Privacy
#### (On Behalf of Plaintiff and the Class)

171.   Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

172.   Plaintiff and the Class hold, and at all relevant times held, a legally protected privacy interest in their PII and content on their mobile devices and in their other social media accounts that Defendants have taken.

173.   There is a reasonable expectation of privacy concerning Plaintiff's and the Class's data and content under the circumstances present.

174.   The reasonableness of Plaintiff's and the Class's expectation of privacy is supported by the undisclosed, hidden, and non-intuitive nature of Defendants' taking of private and personally identifiable data and content from Plaintiff's and the Class's mobile devices and other social media accounts, through the use of dark patterns and otherwise.

175.   Defendants' conduct constitutes and, at all relevant times, constituted a serious invasion of privacy, as Defendants either did not disclose at all, or failed to make an effective disclosure, that they would take and make use of – and allow third-party companies to take and make use of—Plaintiff's and the Class's private and personally identifiable data and content. Defendants intentionally invaded Plaintiff's and the Class's privacy interests by intentionally designing the app to surreptitiously obtain, improperly gain knowledge of, review, and retain their PII and content.

176.   These intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature, and governmental enforcement and

investigative efforts to protect consumer privacy against surreptitious technological intrusions.

177. The offensiveness of Defendants' intrusion is heightened by Defendants' making Plaintiff's and the Class's private and personally identifiable data and content available to third parties for a prolonged amount of time, without any notice. The offensiveness of Defendants' intrusion is further heightened by Defendants' clandestine collection and transfer of Plaintiff's and the Class's private and personally identifiable data and content from their other social media accounts. Further, Defendants' conduct targeted Plaintiff's and the Class's mobile devices, which the United States Supreme Court has characterized as almost a feature of human anatomy, and which contain Plaintiff's and the Class's private and personally identifiable data and content.

178. Plaintiff and the Class were harmed by, and continue to suffer harm as a result of, the intrusion as detailed throughout this Complaint.

179. Defendants' conduct was a substantial factor in causing the harm suffered by Plaintiff.

180. As a direct and proximate result of Defendants' unlawful invasions of privacy, Plaintiff's and Class members' reasonable expectations of privacy were frustrated and defeated. Defendants' unlawful invasions of privacy damaged Plaintiff and Class members as set forth above, and they are entitled to appropriate relief.

181. Plaintiff and the Class seek nominal and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure Plaintiff and the Class, and were made in conscious disregard of their rights. Punitive damages are also warranted to deter Defendants from engaging in future misconduct.

182. Plaintiff and the Class seek injunctive relief to rectify Defendants' actions, including, but not limited to, requiring Defendants to stop taking more

private and personally identifiable data and content of Plaintiff and the Class from their mobile devices and their other social media accounts than is reasonably necessary to operate the app; to make clear disclosures of Plaintiff's and the Class's private and personally identifiable data and content that is reasonably necessary to operate the app; to obtain Plaintiff's and the Class's consent to the taking of their private and personally identifiable data and content; to stop transferring Plaintiff's and the Class's private and personally identifiable data and content to third parties; and to recall and destroy Plaintiff's and the Class's private and personally identifiable data and content already taken in contravention of Plaintiff's and the Class's right to privacy under the common law.

183. A person acting in conscious disregard of the rights of another is required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. Disgorgement is available for conduct that constitutes "conscious interference with a claimant's legally protected interests," including tortious conduct or conduct that violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust Enrichment, §§ 40, 44. Plaintiff and the Class seek restitution and disgorgement for Defendants' violation of their privacy rights.

## FOURTH CAUSE OF ACTION
### Intrusion Upon Seclusion
### (On Behalf of Plaintiff and the Class)

184. Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

185. "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." Restatement (2nd) of Torts § 652B.

186. Plaintiff and the Class have, and at all relevant times had, a reasonable expectation of privacy in their mobile devices and their other social media accounts,

and their private affairs include their past, present and future activity on their mobile devices and their other social media accounts.

187.   The reasonableness of Plaintiff's and the Class's expectations of privacy is supported by the undisclosed, hidden, and non-intuitive nature of Defendants' taking of private and personally identifiable data and content from Plaintiff's and the Class's mobile devices and other social media accounts.

188.   Defendants intentionally intruded upon the Plaintiff's and the Class's solitude, seclusion, and private affairs—and continue to do so—by intentionally designing the app to surreptitiously obtain, improperly gain knowledge of, review, and retain Plaintiff's and the Class's PII and content.

189.   These intrusions are highly offensive to a reasonable person, as evidenced by substantial research, literature, and governmental enforcement and investigative efforts to protect consumer privacy against surreptitious technological intrusions. The offensiveness of Defendants' intrusion is heightened by Defendants' clandestine collection and transfer of the Plaintiff's and the Class's PII and content from their other social media accounts. Further, Defendants' conduct targeted the Plaintiff's and the Class's mobile devices, which the United States Supreme Court has characterized as almost a feature of human anatomy, and which contain the Plaintiff's and the Class's private and personally identifiable data and content.

190.   Plaintiff and the Class were harmed by, and continue to suffer harm as a result of, the intrusion as detailed throughout this Complaint.

191.   Defendants' conduct was a substantial factor in causing the harm suffered by the Plaintiff and the Class.

192.   Plaintiff and the Class seek nominal and punitive damages as a result of Defendants' actions. Punitive damages are warranted because Defendants' malicious, oppressive, and willful actions were calculated to injure the Plaintiff and

1   the Class and were made in conscious disregard of their rights. Punitive damages

2   are also warranted to deter Defendants from engaging in future misconduct.

3       193.   Plaintiff and the Class seek injunctive relief to rectify Defendants'

4   actions, including, but not limited to, requiring Defendants to stop taking more

5   private and personally identifiable data and content from Plaintiff's and the Class's

6   mobile devices and other social media accounts than is reasonably necessary to

7   operate the app; to make clear disclosures of Plaintiff's and the Class's private and

8   personally identifiable data and content that is reasonably necessary to operate the

9   app; to obtain Plaintiff's and the Class's consent to the taking of such private and

10  personally identifiable data and content; to stop transferring Plaintiff's and the

11  Class's private and personally identifiable data and content; and to recall and

12  destroy Plaintiff's and the Class's private and personally identifiable data and

13  content already taken in contravention of the Plaintiff's and the Class's privacy

14  rights.

15      194.   A person acting in conscious disregard of the rights of another is

16  required to disgorge all profit because disgorgement both benefits the injured

17  parties and deters the perpetrator from committing the same unlawful actions again.

18  Disgorgement is available for conduct that constitutes "conscious interference with

19  a claimant's legally protected interests," including tortious conduct or conduct that

20  violates another duty or prohibition. Restatement (3rd) of Restitution and Unjust

21  Enrichment, §§ 40, 44. Plaintiff and the Class seek restitution and disgorgement

22  for Defendants' intrusion upon seclusion.

### FIFTH CAUSE OF ACTION
**Violation of the California Unfair Competition Law,
Cal. Bus. & Prof. Code §§ 17200 *et seq.*
(On Behalf of Plaintiff and the California Subclass)**

26      195.   Plaintiff repeats and incorporates by reference all preceding

27  paragraphs as if fully set forth herein.

28

---

196.   The Unfair Competition Law, California Business & Professions Code §§ 17200, *et seq.* (the "UCL"), prohibits any "unlawful," "unfair," or "fraudulent" business act or practice, which can include false or misleading advertising.

197.   Defendants violated, and continue to violate, the "unlawful" prong of the UCL through violation of statutes, constitutional provisions, and common law, as alleged herein.

198.   Defendants violated, and continue to violate, the "unfair" prong of the UCL because they took PII and content from Plaintiff's and the California Subclass's mobile devices and other social media accounts under circumstances in which the Plaintiff and the California Subclass would have no reason to know that such data and content was being taken.

199.   Plaintiff and the California Subclass had no reason to know because there was no effective disclosure of the wide range of PII and content that Defendants took from Plaintiff's and the California Subclass's mobile devices and other social media accounts.

200.   Defendants violated, and continue to violate, the "fraudulent" prong of the UCL because Defendants made it appear that the Plaintiff's and the California Subclass's PII would not be collected and transferred, but in fact, Defendants collected and transferred such data and content without proper notice or consent; Defendants covertly transferred such data and content to s third-party companies without notice or consent; and (Defendants intentionally refrained from disclosing the use to which Plaintiff's and the California Subclass's private and personally identifiable data and content has been put.

201.   Plaintiff and the California Subclass were misled by Defendants' concealment and had no reason to believe that Defendants had taken the PII and private content that they had taken.

202.   In addition, Defendants engaged in unlawful acts and practices by maintaining sub-standard security practices and procedures as described herein, by collecting and profiting from Plaintiff's and Class members' PII knowing that it would not be adequately protected, and by storing Plaintiff's and Class members' PII in an unsecure electronic environment in violation of California's data breach statute, Cal. Civ. Code § 1798.81.5, which requires Defendants to implement and maintain reasonable security procedures and practices to safeguard the PII of Plaintiff and the California Subclass.

203.   In addition, Defendants engaged in unlawful acts and practices by failing to disclose the Data Breach to the Plaintiff and the California Subclass in a timely and accurate manner contrary to the duties imposed by Cal. Civ. Code § 1798.82.

204.   Plaintiff and the California Subclass have been harmed and suffered economic injury as a result of Defendants' UCL violations. First, Plaintiff and the California Subclass suffered harm in the form of diminution of the value of their PII and content. Second, they suffered harm to their mobile devices. The battery, memory, CPU and bandwidth of such devices have been compromised, and as a result the functioning of such devices has been impaired and slowed. Third, they incurred additional data usage and electricity costs that they would not otherwise have incurred. Fourth, they suffered harm as a result of the invasion of privacy stemming from Defendants' covert theft of their PII and content.  Fifth, they suffered harm stemming from the exposure of their PII in the Data Breach.

205.   Defendants, as a result of their conduct, have been able to reap unjust profits and revenues in violation of the UCL. This includes Defendants' profits and revenues from their targeted-advertising, improvements to their artificial intelligence technologies and increased consumer demand for and use of Defendants' other products. Plaintiff and the California Subclass seek restitution and disgorgement of these unjust profits and revenues.

206. Unless restrained and enjoined, Defendants will continue to misrepresent their private and personally identifiable data and content collection and use practices and will not recall and destroy Plaintiff's and the California Subclass's wrongfully collected private and personally identifiable data and content. Accordingly, injunctive relief is appropriate.

**SIXTH CAUSE OF ACTION**
**Violation of the California False Advertising Law,**
**Cal. Bus. & Prof. Code §§ 17500 *et seq.***
**(On Behalf of Plaintiff and the California Subclass)**

207. Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

208. California's False Advertising Law (the "FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*, prohibits "any statement" that is "untrue or misleading" and made "with the intent directly or indirectly to dispose of" property or services.

209. Defendants' advertising is, and at all relevant times was, highly misleading. Defendants do not disclose at all, or do not meaningfully disclose, the PII and content that they have collected and transferred from the Plaintiff's and the California Subclass's mobile devices and other social media accounts. Nor do Defendants disclose that the Plaintiff's and the California Subclass's PII and content has been made available to third parties.

210. Reasonable consumers, like Plaintiff and the California Subclass, are—and at all relevant times were—likely to be misled by Defendants' misrepresentations. Reasonable consumers lack the means to verify Defendants' representations concerning their data and content collection and use practices, or to understand the fact or significance of Defendants' data and content collection and use practices.

211. Plaintiff and the California Subclass have been harmed and have suffered economic injury as a result of Defendants' misrepresentations. First, they have suffered harm in the form of diminution of the value of their private and

personally identifiable data and content. Second, they have suffered harm to their mobile devices. The battery, memory, CPU and bandwidth of such devices have been compromised, and as a result the functioning of such devices has been impaired and slowed. Third, they have incurred additional data usage and electricity costs that they would not otherwise have incurred. Fourth, they have suffered harm as a result of the invasion of privacy stemming from Defendants' covert theft of their PII and content never intended for public consumption.

212.   Defendants, as a result of their misrepresentations, have been able to reap unjust profits and revenues from targeted-advertising, improvements to their artificial intelligence technologies, and increased consumer demand for and use of Defendants' other products. Plaintiff and the California Subclass seek restitution and disgorgement of these unjust profits and revenues.

213.   Unless restrained and enjoined, Defendants will continue to misrepresent their PII data and content collection and use practices and will not recall and destroy Plaintiff's and the California Subclass's wrongfully collected private and personally identifiable data and content. Accordingly, injunctive relief is appropriate.

## SEVENTH CAUSE OF ACTION
### Violation of the California Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq.*
### (On Behalf of the Plaintiff and the California Subclass)

214.   Plaintiff repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

215.   The CCPA recently was enacted to protect consumers' personal information from collection and use by businesses without appropriate notice and consent.

216.   Through the above-detailed conduct, Defendants violated the CCPA by, inter alia, collecting and using personal information without providing consumers with notice consistent with the CCPA, in violation of Civil Code

section 1798.100(b) and section 1798.115(d), and by otherwise failing to inform users of the personal information collected about them and the third parties with whom that personal information was shared, in violation of Civil Code section 1798.110(c).

217.    Defendants also violated the CCPA by failing to provide notice to their users of their right to opt-out of the disclosure of their biometric information to unauthorized third parties, like Facebook. Defendants did not give Plaintiff and the California Subclass members the opportunity to opt out before they provided their biometric information to unauthorized third parties.    Indeed, regulations approved in March by California's Office of Administrative Law amended the existing CCPA regulations by expressly banning the use of dark patterns to subvert or impair the process for consumers to optout of the sale of personal information.[24]

218.    Defendants also violated the CCPA by failing to prevent Plaintiff's and California Subclass members' nonencrypted and nonredacted PII from unauthorized disclosure as a result of Defendants' violation of their duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, in violation of Civil Code section 1798.150(a). Defendants' policies and practices failed to hold Plaintiff's and California Subclass members' personal information secure. This unauthorized dissemination and prolonged vulnerability of Plaintiff's and California Subclass members' personal information is exactly what the CCPA is intended to make actionable.

219.    In accordance with Civil Code section 1798.150(b), prior to the filing of this complaint, Plaintiff's counsel served Defendants with notice of these CCPA violations by certified mail, return receipt requested.

220.    On behalf of California Subclass members, Plaintiff seeks injunctive relief in the form of an order enjoining Defendants from continuing to violate the CCPA. If Defendants fail to respond to Plaintiff's notice letter or agree to rectify

---

[24] Cal. Code Regs. Tit. 11, Div. 1, Chap. 20 § 999.315(h).

the violations detailed above within 30 days of the date of written notice, Plaintiff also will seek leave to amend this Complaint to assert claims for actual, punitive, and statutory damages, restitution, attorneys' fees and costs, and any other relief the Court deems proper as a result of Defendants' CCPA violations.

### EIGHTH CAUSE OF ACTION
**Violation of the California Comprehensive Data Access and Fraud Act**
**Cal. Pen. Code § 502**
**(On Behalf of Plaintiff and the California Subclass)**

221.    Plaintiff repeats and incorporate by reference all preceding paragraphs as if fully set forth herein.

222.    Defendants' acts violate Cal. Pen. C. § 502(c)(1) because they knowingly accessed, and continue to knowingly access, data and computers to wrongfully control or obtain data. Plaintiff's and the California Subclass's private and personally identifiable data and content accessed by Defendants far exceeds any reasonable use of the Plaintiff's and the California Subclass's data and content to operate the Bumble app. There is no justification for Defendants' surreptitious collection and transfer of the Plaintiff's and the Class's PII and content from their mobile devices and other social media accounts.

223.    Defendants' acts violate Cal. Pen. Code § 502(c)(2) because they have knowingly accessed and without permission taken, copied, and made use of data from a computer—and they continue to do so. Defendants did not obtain permission to take, copy, and make use of the Plaintiff's and the California Subclass's private and personally identifiable data and content from their mobile devices and their other social media accounts.

224.    Plaintiff and the California Subclass are entitled to compensatory damages, including "any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access," injunctive relief, and attorneys' fees. Cal. Pen. Code § 502(e)(1), (2).

## VIII.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests for himself and all others similarly situated, the following relief:

a.     For an order certifying this action as a class action, defining the Class and Subclass as requested herein, appointing the undersigned as Class counsel, and finding Plaintiffs to be proper representatives of the Class and Subclass.

b.     For a permanent injunction and any other equitable relief as necessary to protect the interest of the Classes, including:

   i.     An order declaring Defendant's conduct alleged herein unlawful and prohibiting Defendant from engaging in the wrongful and unlawful acts; and

   ii.     Requiring Defendant to develop and adopt appropriate security protocols to protect its consumers' accounts, personal information, and privacy.

c.     An award of all recoverable damages including punitive damages, as well as attorneys' fees and costs recoverable under the claims pleaded herein, as well as any such other relief as is just and proper.

## IX.  **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: April 8, 2022                **LYNCH CARPENTER, LLP**

                          By:   */s/ Todd D. Carpenter*
                          Todd D. Carpenter (CA Bar No. 234464)
                          todd@lcllp.com
                          1350 Columbia St., Ste. 603
                          San Diego, California 92101
                          Tel:   (619) 762-1900
                          Fax:   (619) 756-6991

**LYNCH CARPENTER, LLP**
Katrina Carroll
katrina@lcllp.com
111 W. Washington St., Ste. 1240
Chicago, IL 60602
Tel.:  312-750-1265

*Attorneys for Plaintiff*
*and the Proposed Classes*