1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                        SOUTHERN DISTRICT OF CALIFORNIA

10   RYAN CHIEN, individually and on behalf      Case No.:  3:22-cv-00020-GPC-NLS
     of all others similarly situated,
11                                               **JUDGMENT AND ORDER:**
                                     Plaintiffs,
12                                               **(1) GRANTING IN PART**
     v.                                          **DEFENDANTS' MOTION TO**
13                                               **DISMISS FOR LACK OF PERSONAL**
     BUMBLE INC., BUZZ HOLDINGS L.P.,            **JURISDICTION**
14   and BUMBLE TRADING LLC,
                                                 **(2) GRANTING DEFENDANTS'**
15                                  Defendants.   **MOTION TO COMPEL**
                                                 **ARBITRATION**
16
17                                               **[ECF No. 24]**
18
19

20          Before the Court is a Motion to Dismiss, or in the alternative to Compel Arbitration,

21   Plaintiff Ryan Chien's First Amended Complaint, filed by Defendants Bumble Inc., Buzz

22   Holdings L.P., and Bumble Trading LLC (collectively referred to as "Bumble" except

23   where otherwise indicated).  (ECF No. 24.)   For the reasons set forth below, the Court

24   **GRANTS IN PART** Defendants' motion to dismiss for lack of personal jurisdiction and

25   **GRANTS** Defendants' motion to compel arbitration.

26
27
28                                          1

## I.    BACKGROUND

Plaintiff Ryan Chien filed his putative class action complaint against Bumble Inc. and Buzz Holdings L.P. (Buzz Holdings) on November 24, 2021 in the Superior Court of California. (ECF No. 1-2 at 7.[1])  Defendants Bumble Inc. and Buzz Holdings removed the action to this Court on January 6, 2022.  (ECF No. 1.)  Chien amended his complaint in April to include Bumble Trading LLC (Bumble Trading) as a defendant, (ECF No. 18), after Bumble Inc. and Buzz Holdings challenged this Court's jurisdiction in March. (ECF No. 16.)

Chien's operative First Amended Class Action Complaint ("Complaint" or "FAC") concerns several privacy-related torts.  (*See* FAC ¶¶ 152-224.)  The causes of action arise from the allegedly unauthorized collection, use, and disclosure of users' personally identifiable information ("PII") and biometric information.  (*Id.* at ¶ 1.) The medium through which these data were collected and used was an internet-based dating application called Bumble ("App").  (*See* FAC ¶ 2.)  The App is free to download on mobile or desktop devices but has premium features available for purchase via subscription or in-app purchases.  (FAC ¶ 24; ECF Nos. 30-1 at 31; 16-3 at 2.)

"Bumble Trading . . . is responsible for decision making and marketing the . . . [A]pp in the United States."  (ECF No. 30-1 at 6; *see also* ECF No. 24-2 at 2 ("Bumble Trading LLC operates the Bumble App globally . . . .").)  Chien alleges that "Bumble Inc. directs and controls the operations of [Bumble Trading]," (FAC ¶ 27), whereas Bumble denies that either Bumble Inc. or Buzz Holdings have ever "owned, operated, or controlled the app, or collected, stored, managed, used or disclosed Bumble app user information," (ECF Nos. 24-1 at 12, 16; 24-2 at 3).  Bumble instead alleges that Bumble Inc. and Buzz Holdings "are holding companies that do not conduct any operational activities in the United States." (ECF No. 24-1 at 16.)

---

[1] Page numbers are based on the CM/ECF pagination.

The App is primarily used for dating and relationships, (FAC ¶¶ 2-3), though there are different versions intended for establishing new friendships as well as for professional networking, (FAC ¶ 50).  Users create an account by providing PII including their name, username, email address, mobile number, gender identity, date of birth, sexual preference, photograph, geographic location, and various social media account information.  (FAC ¶ 6.)  In addition to uploading photographs to their profiles, users may share other personal information with other users such as personal photographs as well as their "name, age, education, smoking and drinking preferences, voting status, political preference, religious beliefs[,] and zodiac sign."  (FAC ¶ 7.)  As of March 2020 Bumble estimates that there were "over 75,000 unique users of the Bumble app . . . associated with registrations in the United States."  (ECF No. 1-3 at 2.)  Chien estimates "[u]pon information and belief" that Bumble generates "revenue from thousands of paying users [residing] in California," including the Southern District of California.  (FAC ¶ 41.)

The Complaint alleges that Bumble "unlawful[ly] and intentional[ly] collect[ed] and use[d] . . . users' [PII], including biometric information . . . , without their consent and [had a] subsequent unauthorized disclosure of that information in violation of state law."  (FAC ¶¶ 1, 12.)  The Complaint identifies the types of information it alleges Bumble collected and sometimes shared for profit:  device and payment information, (FAC ¶¶ 8, 61); click statistics, (FAC ¶ 8, 61); geolocation, (FAC ¶ 10); and PII and biometric information as described above, (*see* FAC ¶¶ 11, 60-68).  The Complaint alleges that much of this information qualifies as "personal information" as defined by the California Consumer Protection Act.  (FAC ¶ 62; *see also* ECF No. 30-1 at 54.)  Bumble allegedly "deriv[es] significant benefit from customers' PII" by "collect[ing], retain[ing], and us[ing] that data to maximize profits through predictive marketing and other targeted marketing practices."  (FAC ¶ 59.)

In addition to collecting and using the above-described information allegedly without adequate user consent, (FAC ¶¶ 79-88), the Complaint details a data breach[2] from March 2020, (see FAC ¶¶ 101-11).  With relative ease a San Diego-based research group[3] was able to access "Bumble's entire user database of nearly 100 million users and bypassed paying for the app's premium services by finding and exploiting the app's security vulnerabilities." (FAC ¶101.)  The group "was able to reverse engineer [Bumble's] web [Application Program Interface ("API")] to intercept all of its incoming and outgoing" communications.  (FAC ¶¶ 102-04.)  Because Bumble's API allegedly did not conduct security checks that are typical in the industry, the group was able to "repeatedly probe the server for information on Bumble users."  (FAC ¶¶ 103-04.)  "The leaked data on each user included their public profile descriptions . . . ."; their "activity on the app, . . . sexual orientation and their 'wish'—the types of people they are looking to date based on their 'swiping' record"; as well as their pictures and Facebook account information if connected to their Bumble account.  (FAC ¶¶ 106-07.)  The Complaint also alleges that whether a user was "online in real-time, and their distance in miles from the person accessing the data" would have been accessible in the breach.  (FAC ¶ 108.)

The group notified Bumble of the App's vulnerabilities four times between March 2020 and July 2020 but did not hear back until they asked about publishing the information.  (FAC ¶ 109.)  At least until November 1 the group reported that all the vulnerabilities still

---

[2] At the motion hearing, Bumble challenged whether "data breach" is an appropriate term for the alleged events.  (ECF No. 34 at 6 (Transcript).)  Although unclear at this juncture whether any users' data were leaked to individuals with bad intentions, "data breach" appears to be the correct legal terminology given the data were "subject to use and misuse by" at least the researchers.  See Data Breach, Black's Law Dictionary (11th ed. 2019) ("A failure in cybersecurity whereby sensitive information stored in a computer or in the cloud is subject to use and misuse by those who should have no access to it.").

[3] The Complaint provides a hyperlink to an online Forbes article describing the data breach as well as the researchers that discovered the App's vulnerability.  (FAC ¶ 104 n.21).  Thomas Brewster, *Bumble Vulnerabilities Put Facebook Likes, Locations and Pictures of 95 Million Daters at Risk*, Forbes (Nov. 15, 2020, 9:30 AM), https://www.forbes.com/sites/thomasbrewster/2020/11/15/bumble-vulnerabilities-put-facebook-likes-locations-and-pictures-of-95-million-daters-at-risk/?sh=6bfd30653ddf.

existed and it was not until November 11 "that certain issues had been partially mitigated." (FAC ¶ 110.)  Bumble allegedly still "has not notified its users of the vulnerabilities that left their data unprotected for over 200 days."  (FAC ¶ 111.)

Bumble neither confirms nor denies that this breach occurred.  (*See* ECF No. 24-1 at 22-23.)  The Complaint alleges that a Bumble spokesperson denied that any user data had been compromised.  (FAC ¶ 111.)

Chien asserts putative class action claims for (1) negligence; (2) restitution and unjust enrichment; (3) invasion of privacy; (4) intrusion upon seclusion; (5) violating California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 1720017210; (6) violating California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500–17509; (7) violating California Consumer Privacy Act, Cal. Civ. Code §§ 1798.100–.199.100; and (8) violating California Comprehensive Data Access and Fraud Act, Cal. Pen. Code § 502, (FAC ¶¶ 152-224).

In June 2022 Bumble filed the motion to dismiss that is presently before the Court. (ECF No. 24.)  Bumble asks the Court to dismiss Chien's claims due to a lack of personal jurisdiction over Bumble or to compel arbitration pursuant to an allegedly valid arbitration agreement.  (*Id.* at 2; ECF 24-1 at 25.)  Chien has filed his response in opposition to the motion to dismiss, (ECF No. 29), Bumble has filed its reply, (ECF No. 30), the Court heard oral arguments on the matter, (ECF No. 32), and both Chien and Bumble filed supplemental briefing after the hearing, (ECF Nos. 35, 36).

## II.   BUMBLE'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Bumble moves to dismiss all claims for lack of personal jurisdiction under Federal Rule of Civil Procedure ("Rule") 12(b)(2).  (ECF No. 24-1 at 13-24.)  Chien opposes this motion.  (ECF No. 29.)

## A.    Legal Standard

A defendant may move to dismiss a case based on lack of personal jurisdiction under Rule 12(b)(2).  When the defendant challenges personal jurisdiction "the plaintiff bears the burden of establishing that jurisdiction is proper."  *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011).  "Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons."  *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014); *see Mavrix Photo*, 647 F.3d at 1223 ("Where, as here, no federal statute authorizes personal jurisdiction, the district court applies the law of the state in which the court sits."); Fed. R. Civ. P. 4(k)(1)(A).  Under California's long-arm statute, California state courts may exercise personal jurisdiction "on any basis not inconsistent with the Constitution of this state or of the United States." Cal. Code of Civ. Proc. § 410.10. "California's long-arm . . . statute is coextensive with federal due process requirements, [so] the jurisdictional analyses under state law and federal due process are the same." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800-01 (9th Cir. 2004); *Mavrix Photo*, 647 F.3d at 1223.  For the exercise of jurisdiction to be consistent with due process, a defendant must have sufficient "minimum contacts" with the forum state such that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

When there has been no evidentiary hearing "the plaintiff need only make a prima facie showing of jurisdictional facts." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011) (quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2010)); *see Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977).  "Although the plaintiff cannot 'simply rest on the bare allegations of its complaint,' uncontroverted allegations in the complaint must be taken as true." *Schwarzenegger*, 374 F.3d at 800 (quoting *Amba Marketing Sys., Inc. v. Jobar Int'l*, 551 F.2d 784, 787 (9th Cir. 1977)).  The Court "may not assume the truth of allegations in

6

a pleading which are contradicted by affidavit . . . but [the Court] resolve[s] factual disputes in the plaintiff's favor." *Mavrix Photo*, 647 F.3d at 1223 (omission in original) (quoting *Data Disc*, 557 F.2d at 1154).   Furthermore, plaintiffs must demonstrate personal jurisdiction over each defendant individually.   *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 459 (9th Cir. 2007) ("It is well established that, as a general rule, where a parent and a subsidiary are separate and distinct corporate entities, the presence of one . . . in a forum state may not be attributed to the other[.]"); *Sher v. Johnson*, 911 F.2d 1357, 1365 (9th Cir. 1990) ("Liability depends on the relationship between the plaintiff and the defendants and between the individual defendants; jurisdiction depends only upon each defendant's relationship with the forum.").

### B.    Discussion

Bumble argues the Court lacks both general and specific jurisdiction over the three defendants.   (ECF No. 24-1 at 14-15.)   Chien concedes that the matter of general jurisdiction "is not at issue here." (ECF No. 29 at 12.)   As such, the Court addresses general jurisdiction only briefly.

### 1.    General personal jurisdiction

"A court may assert general jurisdiction over foreign (sister-state or foreign country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).   A corporation is subject to general jurisdiction in its place of incorporation and principal place of business.   *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).   Otherwise, only "in an exceptional case" should a court find a corporation's operations in the forum to "be so substantial and of such a nature as to render the corporation at home in that State." *Id.* at 139 n.19.   Exceptional circumstances, as noted in *Daimler*, do not exist merely whenever "a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' " but only when "that corporation's 'affiliations with the State are so

7

"continuous and systematic" as to render [it] essentially at home in the forum State.' " *Id.* at 139 (alteration in original) (quoting *Goodyear*, 564 U.S. at 919).

All three Bumble defendants have their principal places of business in Austin, Texas and are incorporated in Delaware or are otherwise a Delaware limited partnership or Delaware limited liability company. (FAC ¶¶ 19, 30, 32; ECF No. 24-1 at 14-15.)  Bumble argues it is not subject to general jurisdiction in California, (ECF No. 24-1 at 14-15), and Chien does not challenge this issue, (ECF No. 29 at 12).  The Court proceeds under the assumption that it lacks general jurisdiction over Bumble.

### 2.    Specific personal jurisdiction

When a court seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit in the forum, the exercise of jurisdiction is consistent with due process if the defendant has "purposefully directed" activities at residents of the forum, *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984), and the litigation results from alleged injuries that "arise out of or relate to" those activities, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984).

The Ninth Circuit applies the following three-prong test for determining if the court has specific jurisdiction over a non-resident defendant:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1227-28 (9th Cir. 2011) (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)); *see also Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 847 F.3d 1064, 1069 (9th Cir. 2017) (identifying effectively same three requirements).  The burden is on the plaintiff to establish that the

first two prongs are met, and upon such a showing "the burden then shifts to the defendant to present a compelling case that the exercise of jurisdiction would not be reasonable." *LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 859 (9th Cir. 2022) (quoting *Axiom Foods*, 874 F.3d at 1068-69). Though all three prongs must be satisfied, a stronger showing of either the first or second prong "will permit a lesser showing on the other." *Id.* (quoting *In re W. States Wholesale Nat'l Gas Antitrust Litig.*, 715 F.3d 716, 742 (9th Cir. 2013)). Bumble challenges only the first two prongs. (ECF No. 24-1 at 16).

> **a.  Chien did not meet his burden to make a prima facie case for the alter ego theory to apply as to either Bumble Inc. or Buzz Holdings.**

Chien argues that it is proper to "[t]reat[ ] all three Defendants as a single unit under the alter ego theory." (ECF No. 29 at 10). Under the alter ego test a court will "determine whether the parent and subsidiary are 'not really separate entities,' such that one entity's contacts with the forum state can be fairly attributed to the other." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1071 (9th Cir. 2015) (quoting *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001), *abrogated on other grounds by Williams v. Yamaha Motor Co.*, 851 F.3d 1015 (9th Cir. 2017)). The alter ego test is satisfied if the plaintiff demonstrates "(1) that there is such unity of interest and ownership that the separate personalities [of the entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." *Id.* at 1073 (second alteration in original) (quoting *Unocal*, 248 F.3d at 926).

There is "unity of interest and ownership" when the subsidiary company is a mere instrument for the parent company. *Id.* Providing financing and macro-management does not automatically expose a parent corporation to personal jurisdiction under the alter ego test. *Id.* at 1074. Rather, conversion and transferring corporate assets such that the subsidiary is left undercapitalized and treating the subsidiary as one with the parent corporation is indicative of unity of interest and ownership. *See Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir. 1996). Factors that counsel

against finding unity of interest and ownership include when a parent company and its subsidiary have separate boards of directors, lease separate facilities, maintain their "own accounting books and records, enter into contracts on [their] own and pay [their] own taxes." *Ranza*, 793 F.3d at 1074.  Courts have found that the alter ego test was not met even when a parent company was "heavily involved in [the subsidiary's] operations" by controlling the subsidiary's overall budget, having "approval authority for large purchases," establishing human resources policies, being involved in some hiring decisions, controlling marketing decisions, and more. *Id.*

Chien's Complaint identifies "Buzz Holdings L.P.," which is a Delaware limited partnership (ECF No. 30-1 at 38), as a defendant and then, without explanation proceeds to refer to it as "Bumble Holding Limited," a non-party English entity.  (*Id.*, FAC ¶¶ 20, 28, 31).  Due to the Complaint's lack of clarity, Chien has not established a prima facie case for this Court to have personal jurisdiction over Buzz Holdings.

Chien makes several allegations in his Complaint supporting the application of the alter ego theory as to Bumble Inc.  First that Bumble holds itself out as a "single operating segment."  (FAC ¶ 21 & n.1 (quoting Bumble Inc. Form 10-K for the fiscal year ended 12/31/21, at 116)[4]). Second that "Bumble Inc. directs and controls the operations of [Bumble Trading], who is responsible for the marketing and advertising of the Bumble app in the United States."  (FAC ¶ 27).  Third that Bumble Inc.'s CEO is also a director for Bumble Trading; Bumble Inc.'s President is also the President of Bumble Trading; and Bumble Inc.'s CFO is also Bumble Trading's CFO.  (FAC ¶ 27).  Chien argues that Bumble Inc.'s capitalization is called into question because Bumble concedes it is a holding

---

[4] Bumble Inc. Form 10-K, available at https://ir.bumble.com/static-files/d9c3cdb9-04a8-4f0d-b694-f31741ca7bbd (last accessed Sept. 13, 2022).  The full quote states that "[t]he company operates as a single operating segment," Bumble Inc. Form 10-K, at 116, and the filing defines "Company" as referring to "Bumble Inc. and its consolidated subsidiaries," *id.* at 2.

company that "has no operations, no revenue, and conduct[s] no business transactions anywhere." (ECF No. 29 at 11 (referring to ECF No. 24-2 at 3).) He also points to a filing from Bumble Trading Inc.'s Chief of Staff in a different proceeding before a different court suggesting "that Bumble Inc. represents itself as a unified entity with a single corporate function spread over multiple subsidiaries when" suitable. (ECF No. 29 at 11 (referring to ECF No. 30-1 at 6-7).)

Bumble argues that the alter ego theory is an "extreme" theory that should be "sparingly used" and is not warranted here. (ECF 24-1 at 17-18 (quoting *Ranza*, 793 F.3d at 1079).) While conceding that four people simultaneously hold managerial positions at Bumble Trading and serve as officers for Bumble Inc. and Buzz Holdings, Bumble submits a declaration from Bumble Trading's VP of Tax and Treasury alleging that the three defendants "have separate finances and corporate books" and "maintain[ ] separate records and operations." (ECF No. 24-2 at 3.) It also alleges that its "entities still observe the corporate formalities necessary to maintain corporate separateness." (ECF No. 30 at 8 (quoting *Pokemon Co. Int'l v. Shopify, Inc.*, No. 16-mc-80272-KAW, 2017 WL 697520, at *4 (N.D. Cal. Feb. 22, 2017)).)

Resolving factual disputes in Chien's favor, *see Mavrix Photo*, 647 F.3d at 1223, the Court does not find that he has alleged facts sufficient to find that there is a unity of interest and ownership between Bumble Inc. and Bumble Trading. The Court acknowledges that Bumble Trading's status as Bumble Inc.'s wholly owned subsidiary does not on its own establish an alter ego relationship. *See Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003) ("[A] parent corporation may be directly involved in the activities of its subsidiaries without incurring liability so long as that involvement is consistent with the parent's investor's status." (quoting *Doe*, 248 F.3d at 926)). And the Court is not persuaded that the crossover of four people holding managerial positions between the three defendants constitutes "extensive commonalities in senior officers." (*See* ECF No. 29 at 10.) Chien's conclusory argument calling into

question Bumble Inc.'s capitalization also fails because he does not to point to any case law suggesting that merely operating as a holding company that lacks a revenue stream amounts to undercapitalization such that the alter ego theory may be warranted. (*See id.* at 5-6 (absence).) And as Bumble notes in reply, (ECF No. 30 at 8), Chien does not point to any facts demonstrating that Bumble Inc. is undercapitalized, (*see* FAC ¶¶ 20-45 (absence)). Although Bumble's SEC filings suggest that it likes to hold itself out to the public "as a single operating segment," (*see, e.g.*, Bumble Inc. Form 10-K at 116), such assertions fall short of suggesting that Bumble Trading is a mere instrumentality of Bumble Inc. *See Ranza*, 793 F.3d at 1073-74.

The alter ego theory does not apply to Bumble Inc. or Buzz Holdings such that Bumble Trading's actions can be imputed to them.

**b.      Specific jurisdiction prong one:  Actions purposefully directed at California**

Having concluded that Bumble Inc. and Buzz Holdings cannot be treated as the same entity with Bumble Trading, the Court turns to whether any defendant has maintained such minimum contacts with the State of California such that it has "purposefully availed [itself] of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws." *Mavrix Photo*, 647 F.3d at 1227 (quoting *Schwarzenegger*, 374 F.3d at 802); *see Walden v. Fiore*, 571 U.S. 277, 291 (2014) ("The proper focus of the 'minimum contacts' inquiry in intentional-tort cases is ' "the relationship among the defendant, the forum, and the litigation." ' " (quoting *Calder v. Jones*, 465 U.S. 783, 788 (1984))). Both sides agree, (*see* ECF No. 24-1 at 19; ECF No. 29 at 13), that a defendant will have satisfied the minimum contacts requirement if it "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Ayla, LLC v. Ayla Skin PTY. LTD.*, 11 F.4th 972, 980 (9th Cir. 2021) (quoting *Axiom Foods*, 874 F.3d at 1069).

\\\

### Buzz Holdings

As discussed above, the Complaint appears to raise allegations against Bumble Holding Limited of the United Kingdom rather than the party identified in the case caption as Buzz Holdings of Delaware and the Court is unable to discern from the pleadings whether specific jurisdiction is proper as to Buzz Holdings. The Court does not discuss the applicability of personal jurisdiction as to Buzz Holdings any further.

### Bumble Trading

Bumble appears to challenge only the second prong of the minimum contacts analysis. (*See* ECF No. 24-1 at 19-22 (addressing only the second prong); ECF No. 30 at 9-10 (same)). Based on Chien's uncontroverted assertions, the Court accepts as true that operations, advertising, and data collection services related to the App are intentional acts and that, to the extent Bumble Trading directed these acts toward California, it knew harm was likely to be suffered in California. (*See* ECF No. 29 at 13, 18-19.)

In the context of a nationally accessible website, "something more" than operating a passive website is required; there must be "conduct directly targeting the forum." *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1210-11 (9th Cir. 2020) (quoting *Mavrix Photo*, 647 F.3d at 1229). The Court may consider factors such as "the interactivity of the defendant's website, [5] . . . the geographic scope of the defendant's commercial ambitions, . . . and whether the defendant 'individually targeted' a plaintiff known to be a forum resident." *Mavrix Photo*, 647 F.3d at 1229. Operating a passive website without any apparent intention to target the forum is not sufficient for purposeful direction, *see Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154-57 (9th Cir. 2006), but "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through

---

[5] Interactive websites involve some "exchange of information" between users and the host computer. *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418 (9th Cir. 1997).

a distributor who has agreed to serve as the sales agent in the forum State" can satisfy the "something more" requirement, *see LNS Enters.*, 22 F.4th at 861 (quoting *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 112 (1987)).  In *Mavrix Photo* the Ninth Circuit reversed a district court's finding that it lacked personal jurisdiction in a copyright infringement case that involved materials posted to a website.  647 F.3d at 1221, 1232.  "Based on the [defendant] website's [California] subject matter, as well as the size and commercial value of the California market," the Ninth Circuit concluded that the defendant "anticipated, desired, and achieved a substantial California viewer base." *Id.* at 1230.

Chien concedes that "simply operating a nationally accessible interactive website is not enough to establish express aiming of conduct" and argues that other factors present in this case demonstrate that Bumble Trading targeted California.  (ECF No. 29 at 13-14).  *See Mavrix*, 647 F.3d at 1229 ("[O]perating even a passive website in conjunction with 'something more'—conduct directly targeting the forum—is sufficient." (quoting *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1020 (9th Cir. 2002))).  Chien alleges that this "something more" requirement is satisfied as to all defendants because Bumble utilizes a highly interactive app that deliberately gathers California users' [PII]", (FAC ¶¶ 35-36, 40; ECF No. 29 at 14); harvests device GPS and Wi-Fi data "each time the Bumble app is opened on a California-based device," (FAC ¶¶ 37-40); "generate[s] revenue from thousands of paying users who reside in California," (FAC ¶¶ 41-42); and further avails itself to the California marketplace "by touting their photo verification feature to potential California-based users" and includes California-specific sections within its privacy policy, (FAC ¶¶ 43-44).  He argues that Bumble's activities aimed at California are purposeful and systemically exploit the California market such that Bumble has purposefully availed itself to the laws of California.  (ECF No. 29 at 16-18.)

3:22-cv-00020-GPC-NLS

Bumble concedes that Bumble Trading "operates the Bumble App globally,"[6] (ECF No. 24-2 at 2), but argues that personal jurisdiction in California is improper because Bumble Trading's contacts with the forum are only incidental.  (ECF No. 24-1 at 19.)  It argues that the App neither specifically targets nor focuses on California and suggests that the California market is not integral to the App's success because most users are outside of California.  (ECF No. 24-1 at 20; *see also* ECF No. 24-2 at 2 (Rosas Decl.).)  Bumble next argues that the App's advertisements and user data collection also did not target California.  (ECF No. 24-1 at 21.)   Bumble compares its contacts to California with those of the defendants in *AMA Multimedia* in which the Ninth Circuit affirmed in relevant part that specific jurisdiction was lacking because the defendant's website content and market was global in nature; the website advertisements were "geo-located," meaning "all users in every forum received advertisements directed at them"; and to the extent that users entered into a contract with the defendant, the plaintiff had not alleged violations of that contract.  970 F.3d at 1210-12.

The Court concludes that Bumble Trading purposefully directed its activities at California.  Bumble does not dispute that the App is highly interactive, which weighs in favor of purposeful direction.  (*See* FAC ¶¶ 8-9, 72-73; ECF No. 29 at 14.)  *See Mavrix Photo*, 647 F.3d at 1229.  The Court is not persuaded by Bumble's argument that the California market is not integral to the App's success on the basis that "the vast majority of the [A]pp's users are outside of California."  (ECF No. 24-1 at 20 (emphasis removed).)  Rosas' Declaration merely states that most users are located outside California, not that the California market is insubstantial.  (ECF No. 24-2 at 2 (Rosas Decl.).)   Neither the declaration nor Bumble's arguments dispute Chien's allegation that Bumble "generate[s] revenue from thousands of paying users [residing] in California."  (FAC ¶ 41; *see also* ECF

---

[6] Bumble denies, however, that Bumble Trading owns, operates, oversees, or maintains "any servers related to [the App] user information in California."  (ECF No. 24-2 at 2 (Rosas Decl.).)

No. 29 at 16; *see* ECF No. 1-3 at 3 (Urquiola Decl.) ("[D]uring the month of March 2020, over 75,000 unique users of the [App] were associated with registrations in the United States.")) This factor favors finding purposeful direction in light of Supreme Court precedent. *Compare Keeton v. Hustler Mag., Inc.*, 682 F.2d 33, 33-34, 36 (1st Cir. 1982), *with Keeton*, 465 U.S. at 773-74, 781 (Supreme Court reversing and remanding finding of no personal jurisdiction when market in forum State amounted to less than one percent of total circulation within United States because dispute arose from those contacts).[7] Other factors alleged that favor finding that Bumble Trading has purposefully availed itself to the forum State include that it has collected personal and location information for the purpose of sending targeted "marketing information," promotions, and advertisements. (ECF No. 30-1 at 32, 56, 58; FAC ¶¶ 8-10, 43, 59, 61.) Bumble Inc.'s December 2021 SEC filing elaborated that it leverages "machine and deep learning capabilities . . . to personalize the potential matches [it] display[s] and to inform [their] product pipeline" and to "target users who are likely to purchase a subscription package or in-app feature and tailor the experience for them." (ECF 30-1 at 31-32.)

The Court additionally finds that, unlike the defendant website that lacked forum-specific subject matter in *AMA Multimedia*, the App here offers value to its users on the basis that its content within the forum State displays other users also presently within the forum State. (*See* FAC ¶ 37-40; ECF No. 30-1 at 32.) *Cf.* 970 F.3d at 1210 (explaining that United States-based adult content uploaded to defendant website does not mean that defendant website's "subject matter is aimed at the U.S. market"). This presents a situation

---

[7] Though true that merely downloading an app in California would not create jurisdiction, *see Good Job Games Bilism Yazilim Ve Pazarlama A.S. v. SayGames LLC*, 458 F.Supp.3d 1202, 1208 (9th Cir. 2020), *rev'd and remanded on other grounds*, No. 20-16123, 2021 WL 5861279 (9th Cir. Dec. 10, 2021), the App's availability for download in California was not mere happenstance but requires some permissive action by Bumble for it to be available in this forum. (*Cf.* ECF No. 30-1 at 35 (Bumble's Dec. 2021 SEC filing explaining that it removed all its apps "from the Apple App Store and Google Play Store in Russia and Belarus" in light of the "Russia-Ukraine Conflict").)

that is also somewhat distinct from *Mavrix Photo* because each user within each forum is viewing content specific to that forum.  *See* 647 F.3d at 1222, 1230.  Accordingly the Court finds that these factors suggest that Bumble Trading " 'continuously and deliberately exploited' the California market for its website," although to a lesser extent than the defendant in *Mavrix Photo.  See id.* at 1230 (quoting *Keeton*, 465 U.S. at 1482).

The Court is further satisfied that Bumble Trading's "suit-related conduct . . . create[d] a substantial connection with the forum State," *see LNS Enters.*, 22 F.4th at 859, considering Chien's uncontroverted allegations regarding the App's unpermitted data breach.  Chien avers—and presents a Forbes article in support—facts that, taken as true, suggest that a San Diego-based research group discovered vulnerabilities in the App's platform, contacted Bumble several times, received an email response from Bumble requesting that the breach not be publicized, and yet Bumble has never notified any users of the breach.  (FAC ¶¶ 101-11.)  Bumble does not challenge the accuracy of these events, (*see* ECF Nos. 24-1, 30 (absence)), and instead argues that any "alleged data breach and collection would presumably have occurred in Texas" and "cannot arise out of any purported California contacts because Bumble Trading does not own or operate servers in California that receive, send, or store Bumble app user data," (ECF No. 24-1 at 22-23). However, the non-forum server location does not preclude a finding of specific jurisdiction when a defendant has otherwise directed activities at the forum state.  *See LNS Enters.*, 22 F.4th at 859.  Bumble informs users that their personal data will not be disclosed "except in limited circumstances," (ECF No. 30-1 at 58) and that Bumble prides itself "on taking all appropriate security measures to help protect [user] information against loss, misuse and unauthorised access, or disclosure," (*id.* at 60); it even has sections of the privacy

policy specific to California users and does not single out any other States,[8] (*see id.* at 54, 61-62). Bumble Trading purposefully directed activities toward California.

### Bumble Inc.

Having found that Bumble Trading purposefully directed its activities regarding the App to California, the Court turns to whether Bumble Inc. has done the same. The Complaint alleges that Bumble Inc. plays an active role in operating, developing, marketing, and controlling the App. (FAC ¶¶ 21-27; *see also* ECF No. 29 at 9, 11-12.) Bumble argues that Bumble Inc. does not and has not ever owned, operated, controlled, or designed the App; collected, managed, stored, disclosed, or used user data; owned, overseen, or maintained the App's servers; advertised the App to California consumers; marketed or sold products related to the App in California or elsewhere; generated revenue from California relating to the App; or conducted any other business activities or transactions in California. (ECF No. 24-1 at 16; *see also* ECF No. 24-2 at 3 (Rosas Decl. asserting the same).) At this time the Court finds in Chien's favor in light of other filings from Bumble suggesting that Bumble Inc. was involved, at least to some extent, in operating, developing, marketing, and controlling the App. These filings include: Bumble Trading, Inc.'s Chief of Staff's declaration in a separate case stating that "Bumble Inc. is involved in marketing decisions for its subsidiaries" and is one of several "parties to the Bumble dating app's terms and conditions entered into with Bumble's users"; (ECF No. 30-1 at 6 (Roche Decl.)) and the December 2021 SEC filing in which Bumble Inc. describes operating the Bumble App as well as leveraging "machine and deep learning capabilities . . . to personalize the potential matches [they] display and to inform [their] product

---

[8] The Court recognizes that a California-specific section in a privacy policy would likely not be enough, by itself, to establish minimum contacts with the forum, *see Handsome Music, LLC v. Etoro USA LLC*, No. LACV 20-08059-VAP (JCx), 2020 WL 8455111, at *7-9 (C.D. CA Dec. 17, 2020), but considers this factor as contributing to some extent to the "something more" requirement given its pertinence to Chien's claims.

pipeline" and to "target users who are likely to purchase a subscription package or in-app feature and tailor the experience for them," (*id.* at 31-32).[9]

Accordingly, the Court finds Bumble Inc. has also purposely directed its activities toward California in light of Bumble Inc.'s role as a parent corporation.

### c.  Specific jurisdiction prong two:  Chien's claims arise out of and relate to Bumble's forum-related activities.

Having found that both Bumble Inc. and Bumble Trading purposefully directed their activities to the forum State, the Court turns to whether Chien's claims "arise out of or relate to the defendant[s'] forum-related activities."  *See Mavrix Photo*, 647 F.3d at 1227-28.  As the Supreme Court has recently clarified, "the phrase 'arise out of' indicates a causal link, but . . . the phrase 'relates to'[ ]'contemplates that some relationships will support jurisdiction without a causal showing.' "  *LNS Enters.*, 22 F.4th at 861 (quoting *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021)).

As to the alleged data breach, Bumble argues that any conduct on its part "would presumably have occurred in Texas, where Bumble Trading is headquartered," and that it does not even "own or operate servers in California that receive, send, or store Bumble app user data."  (ECF No. 24-1 at 22-23.)  But as discussed above, Bumble's forum-related activities that were at least related to, if not causally connected to, the alleged data breach and Chien's corresponding claims, (*e.g.* FAC ¶¶ 153-62), include that a significant portion of paying users reside in California, (FAC ¶ 41); Bumble collected personal and location information for the purpose of sending targeted "marketing information," promotions, and advertisements, (FAC ¶¶ 8-10, 43, 59, 61; ECF No. 30-1 at 32, 56, 58); for users in California, fellow California residents and visitors constituted the App's subject matter,

---

[9] The Court acknowledges that Bumble argues it was not referring to Bumble Inc. when making these statements, (*see* ECF No. 30 at 6), but finds that the SEC filing plainly defines references to " 'Bumble,' the 'Company,' 'we,' 'us' and 'our' [as] refer[ing] to Bumble Inc. *and* its consolidated subsidiaries," not Bumble Inc. *or* its subsidiaries.  (ECF No. 30-1 at 30 (emphasis added).)

3:22-cv-00020-GPC-NLS

(FAC ¶¶ 37-40; ECF No. 30-1 at 30); and that when Bumble was alerted to the App's security flaws by a San Diego-based company, Bumble eventually responded via email but allegedly took over 200 days to remedy some of the problems and has not notified users of the alleged breach, (FAC ¶¶101-11).  The high-interactivity of the App also contributed to the volume of PII and biometric data that Bumble was able to obtain, (*see* ECF No. 29 at 20), further evincing a causal connection between Bumble's forum-related activity and Chien's causes of action.  Regardless of where the App's servers are located or where the defendants are headquartered, these forum-related activities all relate to Chien's claims that Bumble improperly collected user data and acted negligently with storing that data such that it was improperly disclosed.

Bumble argues next that Chien's "false advertising claims cannot arise out of Bumble Trading's purported California contacts because these claims are predicated on nationwide—not California-specific—marketing." (ECF No. 24-1 at 23.)  Bumble points to a link in the Complaint purporting to "encourage residents of California . . . to use the Bumble app," (*see* FAC ¶ 43 & n.5), suggesting it is the only advertisement relevant to the false advertising claim and is not sufficient for specific jurisdiction because it is merely "a blog post that has no California-specific content and is located on Bumble's nationwide website," (ECF No. 24-1 at 23).  But in the context of Chien's false advertising claim, it appears Chien is more concerned about the data Bumble harvests from the targeted advertisements within the App.  (FAC ¶¶ 208-13.)  For the reasons already explained, the Court finds that Bumble's forum-related activities are both causally connected to and related to Chien's causes of action.

Having found that both Bumble Inc. and Bumble Trading purposefully directed activities at the forum State and that Chien's claims arose out of and/or relate to these forum-related activities, the burden shifted to Bumble "to present a compelling case that the exercise of jurisdiction would not be reasonable."  *See LNS Enters.*, 22 F.4th at 859.

Bumble makes no attempt to argue as much.  (*See* ECF Nos. 24-1, 30 (absence).)  The Court finds that it properly has specific jurisdiction over Bumble Inc. and Bumble Trading.

## III.   BUMBLE'S MOTION TO DISMISS FOR IMPROPER VENUE AND TO COMPEL ARBITRATION

### A.   Legal Standard

Under the Federal Arbitration Act ("FAA"), arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "[A] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  The Supreme Court has stated that there is a federal policy favoring arbitration agreements.  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  "[T]he federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate."  *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 476 (1989).  Courts are also directed to resolve any "ambiguities as to the scope of the arbitration clause itself . . . in favor of arbitration." *Id.* at 475-76.  Section Two of the FAA is described as reflecting a "liberal federal policy favoring arbitration" and the "fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 339 (2011) (first quoting *Moses H.*, 460 U.S. at 24, then quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010)).

On a motion to compel arbitration the Court "may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party."  *Macias v. Excel Bldg. Servs. LLC*, 767 F. Supp. 2d 1002, 1007 (N.D. Cal. 2011) ("While the Court may not review the merits of the underlying case '[i]n deciding a motion to compel arbitration, [it] may consider the pleadings, documents of uncontested validity, and affidavits submitted by

either party.' ") (quoting *Ostroff v. Alterra Healthcare Corp.*, 433 F. Supp. 2d 538, 540 (E.D. Pa. 2006)); *see also* Fed. R. Civ. P. 56(c).

### B.    Discussion

Bumble moves to dismiss Chien's lawsuit for improper venue given the alleged agreement between the parties to individually arbitrate disputes. (ECF No. 24-1 at 24.) On a motion to compel arbitration, a court must decide "(1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT & T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986). If these conditions are satisfied, the Court is without discretion to deny the motion and must compel arbitration. 9 U.S.C. § 4; *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration."). The Court also addresses below the validity of the delegation clause that is a part of the arbitration agreement.

### 1.    There was an agreement to arbitrate between the parties.

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs.*, 475 U.S. at 648 (quoting *United Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)); *see Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) ("it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995))). When interpreting "an arbitration agreement, courts must 'apply ordinary state-law principles that govern the formation of contracts.' " *Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1210 (9th Cir. 1998) (quoting *First Options*, 514 U.S. at 944). Bumble argues that only Texas' or California's contract laws could possibly apply to contact

interpretation, and that both would reach the same result. (*See* ECF No. 24-1 at 30-32.) Chien does not weigh in on either side of the choice-of-law debate. (*See* ECF No. 29 at 21-25 (absence).) The Court accordingly applies California law. *Cf. Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (acknowledging the circular inquiry involved when deciding which State's law should apply and selecting one when both would "dictate the same outcome").

Elemental principles of contract formation require that to form a contract, "parties must manifest their mutual assent to the terms of the agreement" as exhibited by written or spoken word or through conduct. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). In cases like the matter before the Court, a website operator can show that a user "manifested assent" to contractual terms either by demonstrating that the user had actual knowledge of the agreement, or that the user took some unambiguous action manifesting assent to the terms, the existence of which the user had reasonably conspicuous notice. *Id.* at 856. Websites typically ask users to consent to contract terms via "clickwrap" or "browsewrap" agreements. *Id.* Clickwrap agreements are more straightforward and "present users with specified contractual terms on a pop-up screen," requiring users to "check a box explicitly stating" that they agree in order to proceed. *Id.* Browsewrap, in contrast, discloses terms "only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website." *Id.*

Bumble asserts that the App's Terms and Conditions of Use were presented to users through a "valid and enforceable clickwrap agreement," (ECF No. 24-1 at 32), whereas Chien appears to suggest that the Terms were categorically neither clickwrap nor browsewrap, but fell somewhere in between, (*see* ECF No. 29 at 22-23), and that he never manifested assent "to the retroactivity of the arbitration agreement." For reference during the following discussion, the Court has incorporated below an image of the "blocker card," which Bumble alleges appeared for every user as of January 2021 and prevented "access

1    to the rest of the app unless and until the[ user] clicked on the 'I accept' button."[10]  (ECF

2    No. 24-1 at 25).

3          The blocker card contains aspects of both clickwrap and browsewrap agreements.  It

4    is comparable to a pop-up screen in that users must click "I accept" before they may

5    proceed, (*see id.*) but the full terms to which they are agreeing are "disclosed only through

6    a hyperlink."  *See Berman*, 30 F.4th at 856.  The distinction is immaterial, however,



24   _____

25   [10] The Court notes that Chien's Complaint alleges that users were not required to agree to the Terms and
26   Conditions to use the App.  (FAC ¶ 84-84, 87.)  He also presented a different screen with a much more
     inconspicuous link for the Terms and Conditions, (*see* FAC ¶¶ 85-86), but has since declined to contest
27   that he took "actions regarding the blocker card," (ECF No. 29 at 24) and the Court does not discuss this
     discrepancy further.
28

because as the Court discusses next, Bumble "provide[d] reasonably conspicuous notice of the terms to which the consumer [would] be bound" and Chien does not argue that the "manifestation of assent" was ambiguous.  (ECF No. 29 at 24-25 (absence).)  *See Berman*, 30 F.4th at 856-58.

For notice to be reasonably conspicuous, it "must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it."  *Id.* at 856.  For example, in *Berman* the Ninth Circuit described the notice given as "the antithesis of conspicuous" because it was "printed in a tiny gray font considerably smaller than the font in the surrounding website elements," and the "surrounding text naturally direct[ed] the user's attention everywhere else."  *Id.* at 856-57.  Indeed, the notice of terms and conditions—including mandatory arbitration—had been sandwiched between large, colorful buttons on a screen also collecting personal information with the promise that the user would receive a reward in return.  *See id.* at 859-61 (images of the browsewrap agreements).  Additionally, a hyperlink disclosing the terms and conditions "must be readily apparent . . . . to alert a reasonably prudent user that a clickable link exists."  *Id.* at 857.  This requires doing "more than simply underscore[ing] the hyperlinked text," such as utilizing contrasting colors and all capital letters.  *Id.*

Chien argues that the blocker card did not give adequately conspicuous notice.  He alleges that the information on the blocker card "actively discourages users from reading the terms of service to discover the true" extent of the terms.  (ECF No. 29 at 24-25.)  He suggests that by discussing some of the Terms in plain language, the blocker card gave users a "false sense of security" and may have led "users to believe, as laypeople, that they agreed to the language written on the blocker card . . . and not the language in the terms and conditions that require a clickthrough."  (*Id.* at 25.)

The Court is not persuaded by Chien's arguments.  Rather than hiding the fact that users were agreeing to contract terms by proceeding through the App, Bumble presented an isolated page, akin to a pop-up, with the solitary purpose of alerting users to the updated

25

arbitration agreement in the Terms and Conditions.  In large bold font the notice alerted users that there were "[u]pdated terms and conditions of use."  (ECF No. 24-3 at 9.)  There were no other buttons or information drawing the user's eye away from the fact that Bumble was offering contractual terms to the user.  *Cf. Berman*, 30 F.4th at 854 (describing inconspicuous notice given to users).  Although users may have been inclined to click the bright yellow button so that they could continue swiping on the App, the fact that the yellow button said "I accept" would have further put the user on notice that they could be manifesting assent to an agreement.  (ECF No. 24-3 at 9.)  *See Berman*, 30 F.4th at 857-58.  And though the hyperlink with the full extent of the Terms and Conditions stands out in terms of font only for being underscored, *see id.* at 857 ("Simply underscoring words or phrases . . . will often be insufficient to alert a reasonably prudent user that a clickable link exists."), the Court finds that it was sufficiently apparent to a reasonably prudent user that the hyperlink existed because, unlike the links in *Berman*, the link here consisted of its own block of text and did not simply constitute part of the same sentence alerting the user to the terms and conditions.  *See id.* at 859-61.  Furthermore, the other information within the blocker card puts a reasonably prudent person on notice that the Terms contained additional information not present on the screen:  "The updated Terms *contain* an Arbitration Agreement that *includes* a class action waiver . . . ." and "Bumble users who signed up before January 18, 2021 *will have* the option to opt out . . . ."[11]  (ECF No. 24-3 at 9.)

The Court finds that the parties entered into an agreement to arbitrate and now turns to the agreement's Delegation Clause.

## 2.    The agreement contains a valid delegation clause.

The arbitration agreement contains a "delegation clause," which states:

---

[11] Bumble presents a declaration that Chien did not opt-out of the arbitration agreement, (ECF No. 24-3 at 3 (Wong Decl.); *see also* ECF No. 24-1 at 26), and Chien does not indicate otherwise, (*see* ECF No. 29 at 22-27 (absence)).

> The arbitrator has the exclusive authority to (i) determine the
> scope and enforceability of this Arbitration Agreement, and (ii)
> resolve any dispute related to the interpretation, applicability,
> enforceability or formation of this Arbitration Agreement
> including, but not limited to, any claim that all or any part of
> this Arbitration Agreement is void or voidable.

(*Id.* at 18 § 13(4).)  A delegation clause is a clause within an arbitration provision that delegates to the arbitrator gateway questions of arbitrability, such as whether the agreement covers a particular controversy or whether the arbitration provision is enforceable at all. *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010).  The FAA "allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, —— U.S. ——, 139 S. Ct. 524 (2019).  However, to find such agreement there must be " 'clea[r] and unmistakabl[e]' evidence that" "the parties agreed to arbitrate arbitrability." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (alterations in original) (quoting *AT & T Techs.*, 475 U.S. at 649).  "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce."  *Rent-A-Center*, 561 U.S. at 70. In *Rent-A-Center*, the Supreme Court held that a challenge to the validity of an entire arbitration agreement—there, an unconscionability challenge—must be decided by the arbitrator if the agreement includes a delegation clause that is not directly challenged.  *Id.* at 70-72.  The Supreme Court emphasized that a party must "challenge[ ] the delegation provision specifically" for a court to intervene.  *Id.* at 71-72. Under *Rent-A-Center*, then, a valid—*i.e.*, enforceable—delegation clause commits to the arbitrator nearly all challenges to an arbitration provision.

In *Caremark , LLC v. Chicksaw Nation*, the Ninth Circuit described the process that a court must take when faced with an arbitration agreement that includes a delegation clause:

> First, a court must resolve any challenge that an agreement to
> arbitrate was never formed, even in the presence of a delegation
> clause.  Next, a court must also resolve any challenge directed

specifically to the enforceability of the delegation clause before compelling arbitration of any remaining gateway issues of arbitrability.  Finally, if the parties did form an agreement to arbitrate containing an enforceable delegation clause, all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first instance.

43 F.4th 1021, 1030 (9th Cir. 2022).

Here, the Court has found that an arbitration agreement was entered into by Plaintiff. Although there has not been a challenge to the delegation clause, a review of the arbitration agreement reveals that it incorporates the JAMS Comprehensive Arbitration Rules ("JAMS Rules") (ECF No. 24-3 at 18 § 13(3)), which explicitly apply to disputes over $250,000 like this one.  (JAMS Rule 1.)  These rules state that "arbitrability disputes, including disputes over the *formation, existence, validity, interpretation or scope* of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, *shall be submitted to and ruled on by the Arbitrator*."  (JAMS Rule 11(b) (emphasis added).)  The JAMS Rules also state that "[t]he Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter." (*Id.*)  This would constitute further proof that the parties agreed to delegate arbitrability to the arbitrator.  *Cf. Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) ("[I]ncorporation of the AAA [American Arbitration Association] rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability.")  Given the lack of a challenge of the delegation clause and the clear and unmistakable evidence that the parties agreed to arbitrate arbitrability, the Court concludes that the delegation clause is valid. Accordingly, unless an exception exists, the remaining issues as to scope and enforceability are for the arbitrator.

> **3.    Whether the agreement covers the present dispute is for the arbitrator to decide.**

Plaintiff raises two distinct issues regarding the arbitration agreement's coverage. First, he asserts that the agreement does not apply retroactively to Chien's claims arising before the January 2021 arbitration agreement was implemented.  (*See* ECF No. 29 at 21-

28

23.)  And second, the agreement is invalid to the extent it prevents Chien from seeking public injunctive relief.  (*See id.* at 23-25.)  *See McGill v. Citibank, N.A.*, 393 P.3d 85, 90-93 (Cal. 2017) (holding agreement to waive right to seek public injunctive relief violated California law).  Both of these issues relate to the scope and enforceability of the arbitration agreement and must be decided by the arbitrator.

Bumble's arbitration agreement is broad in scope and "applies to any dispute or claim relating to [a person's] use of [Bumble's] App or any other aspect of [a person's] relationship with Bumble Group."  (ECF No. 24-3 at 18.)  It also delegates exclusive authority to the arbitrator "to (i) determine the scope and enforceability of this Arbitration Agreement, and (ii) resolve any dispute related to the interpretation, applicability, enforceability or formation of this Arbitration Agreement including, but not limited to, any claim that all or any part of this Arbitration Agreement is void or voidable."  (*Id.*)  Given the breadth of the Arbitration Agreement, the question whether it applies retroactively to Chien's claims arising before the January 2021 arbitration agreement was implemented would be covered.  Whether the arbitration agreement applies retroactively is a matter that should be decided by the arbitrator, not the Court.  *See Salgado v. Carrows Rests. Inc.*, 33 Cal. App. 5th 356, 360-62 (2019) (discussing that comparable terms in an arbitration agreement could apply retroactively).

California law recognizes a narrow exception to arbitration agreements purporting to waive a party's right to seek statutorily permitted public injunctive relief in any forum.  *See id.* at 93-94.  California's Consumers Legal Remedies Act, unfair competition laws, and false advertising laws include provisions for "public injunctive relief, i.e., injunctive relief that has the primary purpose and effect of prohibiting unlawful acts that threaten future injury to the general public."  *Id.* at 87.  The California Supreme Court has found "invalid and unenforceable" "the waiver in a predispute arbitration agreement of the right to seek public injunctive relief under these statutes [because it] would seriously compromise the public purposes the statutes were intended to serve."  *Id.* at 94.  It further

found that such "generally applicable California contract law" is not preempted by the FAA. *Id.* at 95; *see also Blair v. Rent-A-Center., Inc.*, 928 F.3d 819, 827-28 (9th Cir. 2019) (affirming that the "*McGill* rule . . . . falls within the FAA's saving clause.") When parties have agreed to an arbitration clause, "there is a presumption of arbitrability in the sense that 'an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Techs.*, 475 U.S. at 650 (quoting *United Steelworkers*, 363 U.S. at 582). Uncertainty as to whether the arbitration agreement covers a particular dispute "should be resolved in favor of coverage." *Id.* (quoting *Warrior*, 363 U.S. at 583). "Just as a court may not decide a merits question that the parties have delegated to an arbitrator, a court may not decide an arbitrability question that the parties have delegated to an arbitrator." *Henry Schein*, 139 S.Ct. at 530.

Under the Arbitration Agreement, the arbitrator has "the authority to award monetary damages and to grant any non-monetary remedy or relief available to an individual under applicable law." (*Id.*) There is an additional clause requiring that all claims be brought in arbitration on an individual basis, not as a class action and that "[o]nly individual relief is available." (*Id.*) Finally, the agreement contains a severability clause such that any provisions found "to be invalid or unenforceable . . . shall be of no force and effect and shall be severed and the remainder of the Arbitration Agreement shall continue in full force and effect." (ECF No. 24-3 at 18-19.) Chien argues that the arbitration agreement must be invalid to the extent it interferes with his right to seek public injunctive relief. (*See* ECF No. 29 at 25-27.)

Having found that a valid arbitration agreement exists, the Court finds the delegation clause is enforceable in the face of Plaintiff's *McGill* challenge.[12] (See ECF No. 29 at

---

[12] Although Bumble's Terms and Conditions instruct that Texas law applies to "any claims arising from or related to" Bumble, (ECF No. 24-3 at 20), the Court interprets the arbitration agreement under California law due to California's strong interest in resolving the allegations and because an

23-25.)  *See Caremark*, 43 F.4th at 1030 (second principle).  Assuming that some or all of Chien's causes of action constitute requests for public injunctive relief, there is an open question whether they may be raised under the arbitration agreement.  On one hand, the agreement affords "[t]he arbitrator . . . the authority to award monetary damages and to grant any non-monetary remedy or relief available to an individual under applicable law, the arbitral forum's rules, and the Agreement (including the Arbitration Agreement)." (ECF No. 24-3 at 18.)  Bumble argues that this clause would permit the arbitrator to grant public injunctive relief.  (ECF No. 35 at 9; ECF No. 34 at 33-34 (Transcript).)  On the other hand, section 13.6 of the agreement provides that "[o]nly individual relief is available." (ECF No. 24-3 at 18.)[13]   However, if Chien's claims seek public injunctive relief and the arbitrator finds that they are precluded by the agreement in violation of applicable law, then the agreement provides that the claim at issue "be severed from the arbitration and brought into the State or Federal Courts located in Travis County, Texas."  (*Id.*)  Accordingly, there is no enforceability problem under *McGill*.  *See Blair*, 928 F.3d at 831-832 (describing how a severance clause is triggered by the *McGill* rule); *cf. Delisle v. Cash*, No. 3:18-cv-0242, 2020 WL 6817702, at *3 (S.D. Cal. Nov. 20, 2020) ("*McGill* would void the Arbitration Provision's public injunction waiver, which in turn would invalidate the entire Arbitration Provision per the poison pill clause.").

---

interpretation absent the *McGill* rule would be contrary California's public policy.  *See, e.g.*, *Delisle v. Speedy Cash*, 818 Fed. App'x. 608, 611 (9th Cir. 2020) (applying California law to arbitration agreement despite Kansas choice of law provision).

[13] Bumble suggests that this language does not preclude public injunctive relief by pointing to *DiCarlo v. MoneyLion, Inc.*, (ECF No. 34 at 33-35 (Transcript)), a case in which the Ninth Circuit held that an arbitration agreement authorizing "the arbitrator to 'award all [injunctive] remedies available in an individual lawsuit under [California] law' " authorized public injunctive relief.  988 F.3d 1148, 1153-54, 1156, 1158 (9th Cir. 2021) (alterations in original).  On a motion to dismiss the Court is not prepared to find that an agreement that "[o]nly individual *relief* is available," (ECF No. 24-3 at 18 (emphasis added)), would similarly allow for public injunctive relief.

Because the plain text of the arbitration agreement grants exclusive authority to the arbitrator to determine the "scope and enforceability" of the agreement as well as to resolve "interpretation, applicability, enforceability or formation" disputes, the Court agrees with Bumble and concludes that the FAA and binding caselaw require that Chien bring his claims, as well as his disputes related to the applicability and enforceability of the arbitration agreement, before an arbitrator. *See Henry Schein*, 139 S.Ct. at 530. The parties have delegated to the arbitrator the authority to interpret the arbitration agreement, including determining whether the agreement precludes Chien from seeking public injunctive relief and whether such a preclusion runs contrary to the forum's public policy.

## IV.    CONCLUSION

Based on the above, the Court **GRANTS IN PART** Defendants' motion to dismiss for lack of personal jurisdiction and **GRANTS** Defendants' motion to compel arbitration, dismissing the Complaint.

**IT IS SO ORDERED.**

Dated:  November 17, 2022

Hon. Gonzalo P. Curiel
United States District Judge

3:22-cv-00020-GPC-NLS